CITIZENS FOR RURAL PRESERVATION, INC., a not for profit corporation, Clarence Leon Bunch, and Mary Ann Rohan, Plaintiffs-Appellants,

v.

James L. ROBINETT, Jr., Chairman, Barry Wilkinson, Hugh Carr, Jess Garnett, Richard Baalmann, John Howell, and Tom Pirtle, Members, Air Conservation Commission, Department of Natural Resources, State of Missouri, Defendants-Respondents,

and

Six Flags Materials Corporation, Intervenor-Defendant-Respondent.

No. WD 32571.

Missouri Court of Appeals, Western District.

Nov. 16, 1982.

As Modified Jan. 4, 1983.

Lewis C. Green (argued), Green, Hennings & Henry, St. Louis, for plaintiffs-appellants.

Dan Summers, Asst. Atty. Gen. (argued), John Ashcroft, Atty. Gen., Jefferson City, for defendants-respondents.

Albert A. Michenfelder (argued), Steven W. Koslovsky, Ziercher, Hocker, Human, Michenfelder, Nations & Jones, Clayton, for intervenor-defendant-respondent.

Before NUGENT, P.J., and TURNAGE and LOWENSTEIN, JJ.

NUGENT, Presiding Judge.

Plaintiffs appeal from a judgment of the Circuit Court of Cole County upholding an order of the Air Conservation Commission which granted a permit to Six Flags Materials Corporation to construct a quarry and rock-crushing operation in Franklin County. Plaintiffs challenge the order on the grounds that the commission's conclusions relating to ambient air quality in the vicinity of the proposed quarry are not supported by substantial evidence, that certain conditions to the permit are unlawful and inadequate, that the hearing officer failed to make findings of fact, and that the commission improperly denied standing to plaintiff Citizens for Rural Preservation. We reverse on several of these grounds and remand for further proceedings consistent with this opinion.

Lying at the foot of deeply forested hills on the east and west and a 300-foot rock wall on the north is a deep valley in Franklin County which is the subject of this litigation. From 1965 to 1970, an approximately 190-acre tract of land within the valley was the site of a rock quarry. In 1974, the property was leased to Six Flags Materials Corporation and for a period during 1978, was the site of renewed quarry activity.

■ The activity took place, however, without benefit of a permit from the Department of Natural Resources (DNR) to construct and operate the quarry and rock-crushing operation. The permit is required by § 203.075–1 [1] which provides in part that "[i]t shall be unlawful for any person to commence construction of any air contaminant source in this state after August 13, 1972, without a permit therefor. . . ."

The rock-crushing operation is considered an "air contaminant source" because of the dust and other airborne (suspended) particulates raised by its primary crusher, six secondary crushers, various screens and conveyors, storage bins, and stockpiles of rock. In addition, "fugitive emissions" [2] are generated by the traffic of trucks to and from the site, bearing heavy loads on gravel roads. Such traffic must approach the site by either Little Tavern Road, seven-tenths of a mile to the east, or Fiddle Creek Road, an equal distance to the west, both of which are unpaved county roads. Access to the quarry is by private road running east and west, connecting Little Tavern and Fiddle Creek. The property leased by Six Flags includes the east access road all the way to Little Tavern, and about one-half of the

---

1. All sectional references are to Revised Statutes of Missouri, 1978, unless otherwise indicated.

2. "Fugitive emissions" are defined by 10 C.S.R. 10–6.020(2)(F)–7 as "[t]hose emissions which could not ... pass through a stack, chimney, vent, or other functionally equivalent opening."

In this case, the term refers to particulates which have become airborne in some manner other than from the crushing process itself, i.e., from the conveying or stockpiling of rock, from traffic on the on-site haul roads and from traffic on the gravel roads.

west access road. Six Flags holds an easement over the remainder of the west access road to its junction with Fiddle Creek.

On April 5, 1979, Six Flags applied to DNR for the permit required by § 203.075–1. Plaintiffs Citizens for Rural Preservation (CRP), Clarence Bunch, and Mary Ann Rohan were allowed to intervene in the application proceeding.

CRP is a not-for-profit corporation formed for the purpose of promoting, preserving and protecting the rural environment of Franklin County, and uniting "those persons interested in preserving and protecting the rural environment so that the citizens of Franklin County and persons from the surrounding area may continue to have the opportunity to enjoy the unique recreational, educational, social, emotional, physical and aesthetic benefits provided by such rural environment." Some 430 individuals either residing or owning property in the area signed petitions circulated by CRP in opposition to the proposed quarry or contributed financially to CRP's efforts.

Plaintiff Clarence Bunch resides on a tract of land abutting the northern boundary of the property, and his house is approximately 1,450 feet from the point where the crushing equipment would be located. Plaintiff Mary Ann Rohan's property also abuts the site, and her house lies approximately 1,580 feet to the northeast of the crushing operation.

On July 25, 1979, DNR issued a permit, subject to five conditions. Condition No. 4 required that before beginning its operation, Six Flags must surface those portions of Little Tavern and Fiddle Creek Roads which would be used to transport materials to and from the site, in order to control the fugitive emissions.

Six Flags appealed under § 203.075–5 from condition No. 4 only, contending that DNR and the Air Conservation Commission lacked authority to require improvements on premises not under Six Flags' control. CRP, Mr. Bunch, and Ms. Rohan appealed from the issuance of the permit in its entirety.

The appeals were consolidated, and a hearing was held on January 23 and 24, 1980, before Commission Chairman James L. Robinett, Jr., acting as hearing officer pursuant to § 203.100–3(2). At the hearing, Six Flags offered to withdraw its appeal, provided that condition No. 4 was modified to make surfacing of the roads contingent on permission from Franklin County authorities to undertake the surfacing.

The evidence at the hearing consisted primarily of expert testimony from Harvey Shell, an engineering consultant retained by Six Flags; Christa Henson, a DNR environmental engineer; and Thomas Cuscino, an environmental engineer retained by plaintiffs. They testified about the environmental consequences of the emissions of suspended particulates from the proposed operation and various means to control those emissions.

On May 28, 1980, the commission issued an order granting the permit and finding that (1) CRP lacked standing to appeal the issuance of the permit; (2) Six Flags' conditional withdrawal of appeal was accepted; (3) condition No. 4 requiring Six Flags to surface county roads was "unreasonable as written" and should, therefore, be amended to make the surfacing contingent on approval by Franklin County; and (4) the appeal of citizens Bunch and Rohan was denied except to the extent that certain conditions not relevant on this appeal were modified.

The construction permit was granted to Six Flags based on the commission's conclusions that "the proposed operation meets or will meet the requirements of [certain sections of chapter 203] and the regulations promulgated pursuant thereto" and "[t]here are presently no violations of air quality standards in the vicinity near the proposed operation", and that "[t]here will be no violations of air quality standards as a result of the construction and operation of the Six Flags quarry, if permit conditions are obeyed." The permit conditions imposed by the commission are as follows:

(1) Water spray bars shall be installed and operated so as to control fugitive emissions from the crusher to prevent violation of the 20% opacity regulation, in accordance with 10 CSR 10–5.090.

(2) All haul roads on the company's property shall be watered as often as environmental conditions require, to prevent any generation of dust from the roads in excess of 20% opacity, as specified by 10 CSR 10–5.090.

(3) Fugitive emissions from storage piles and product handling operations shall be controlled by as much wetting as necessary to prevent emissions in excess of 20% opacity as specified by 10 CSR 10–5.090.

(4) Those portions of Fiddle Creek Road and Little Tavern Road that will be used to transport material to and from the facility shall be surfaced prior to start up and operation so as to control fugitive emissions from the truck traffic on those roads, such that no visible emissions exist beyond the roads' right-of-way. In the event that the company chooses to use only one of these roads, that road chosen will be the only road requiring surfacing. Those roads used are to be surfaced in a suitable manner so as to result in 85% control of fugitive emissions from the traffic on those roads. Since these are public roads, over which the Commission has no direct control, this condition is made contingent upon the approval of local governmental authorities granting to Six Flags or its agents the permission to perform such surfacing, and if the local governmental authorities do not permit the surfacing to be done, then Six Flags will nevertheless be allowed to operate subject to the construction permit Condition Nos. 1, 2, 3, 5 and 6.

(5) The annual production of crushed rock from the operation shall not exceed 400,000 tons.

(6) Failure to comply with any of the above conditions will constitute a violation of this permit.

Plaintiffs sought judicial review of the commission's order in the circuit court pursuant to § 203.075–7. Six Flags was al-lowed to intervene in that proceeding. On February 5, 1981, the court ruled that the commission's order was supported by competent and substantial evidence upon the whole record and affirmed the order without extended comment.

On appeal, plaintiffs challenge the commission's order on the following grounds: (1) the commission's conclusions relating to present and anticipated ambient air quality in the vicinity of the quarry are not supported by substantial evidence; (2) the amendment of condition No. 4 making surfacing of the gravel roads contingent on approval of Franklin County authorities is an unlawful exercise of the commission's authority; (3) condition No. 4 fails to provide for maintenance of the gravel roads, if surfaced, and does not require surfacing of all roads involved, and is therefore inadequate; (4) condition No. 2 does not deal with the western on-site access road or provide alternative means of control in the event of water shortages, and is therefore inadequate; (5) the hearing officer failed to make recommended findings of fact as required by § 203.100–3(2); and (6) the commission improperly denied standing to CRP.

On examination of these issues, we have determined that several require reversal and remand, as discussed *infra.*

1. *Substantial evidence of present and anticipated ambient air quality in the vicinity*

The Air Conservation Commission and the DNR are obligated under § 203.075–3 to determine both the present and the anticipated quality of the ambient air "in the vicinity" of a permit applicant:

Before issuing a permit to build or enlarge an air contaminant source the executive secretary *shall determine if the ambient air quality standards in the vicinity of the source are being exceeded and shall determine the impact on the ambient air quality standards* from the source. The executive secretary, in order to effectuate the purposes of [certain sections in chapter 203], may deny a permit if the source will appreciably affect the air quality standards or the air quality

standards are being substantially exceeded (emphasis added).

The "ambient air quality standards" referred to in § 203.075–3 are found in 10 C.S.R. 10–6.010. The standards set two tests: (1) the annual geometric mean for suspended particulates is not to exceed sixty micrograms per cubic meter of ambient air, and (2) the 24-hour average, not to be exceeded more than once per year, is to be 150 micrograms per cubic meter. The commission is required to determine, then, whether both the annual and the 24-hour standards "in the vicinity of the source" are met at present and whether they will be met in the future after the "air contaminant source" begins operation.

The commission determined in its conclusions of law that both the present and anticipated ambient air satisfied those regulatory standards. Plaintiffs contend that no substantial evidence to support those findings is shown in the record.

■■■ Our review is limited to a determination of whether the decision was supported by competent and substantial evidence upon the whole record, whether it was arbitrary, capricious or unreasonable, or whether the agency abused its discretion. *Hermel, Inc. v. State Tax Comm'n,* 564 S.W.2d 888, 894 (Mo.1978) (en banc). "Substantial evidence" is defined as competent evidence which, if believed, would have probative force upon the issues. *Brooks v. General Motors Assembly Div.,* 527 S.W.2d 50, 53 (Mo.App.1975). Where the evidence before an agency would warrant either of two opposing conclusions, we are bound by the agency's findings. *Pulitzer Publishing Co. v. Labor and Industrial Relations Comm'n,* 596 S.W.2d 413, 417 (Mo.1980) (en banc). While we may not substitute our judgment for that of the agency, we must ascertain whether the agency could have reasonably made its findings, and reached its result, upon consideration of all the evidence before it. If the findings and conclusions of the agency are clearly contrary to the overwhelming weight of the evidence, we must reverse or order further appropriate action. *Moran v. Whaley,* 608 S.W.2d

446, 448 (Mo.App.1980); *Vlasak v. Alternative System of Police Retirement System of St. Louis,* 435 S.W.2d 726, 729 (Mo.App. 1968).

We now turn to the commission's findings.

### A. *Present ambient air quality*

The commission found that the background concentration of total suspended particulates in northeastern Franklin County is approximately forty micrograms per cubic meter on an annual basis, well below the sixty micrograms maximum set by 10 C.S.R. 10–6.010. That is the only finding relevant to present ambient air quality in the vicinity of the quarry in the commission's order of May 28, 1980, and apparently from it, the commission concluded that ambient air quality standards are not presently being exceeded.

The data supporting that finding of the annual geometric mean was obtained from a monitor located in St. Louis County (referred to as the Civil Defense site) fifteen miles away from the quarry site near a paved, non-public road. Plaintiffs charge that while readings from that monitor may be sufficient to establish background concentrations of suspended particulates in areas of Franklin County removed from gravel roads, they are not sufficient to show concentrations in areas near gravel roads, simply because no gravel roads are in the area of the Civil Defense site. Defendants contend that the data obtained from the Civil Defense site is substantial evidence because it is the closest monitor to the site in the state's air monitoring network and that the purpose of the network is not to measure the impact of emissions from a particular source (such as gravel roads) but to determine the representative air quality most prevalent in the area.

■■■ To resolve the question, we must interpret the meaning of § 203.075–3, which requires a determination of ambient air quality standards "in the vicinity of the source." As we have noted, we are not empowered to substitute our opinion for

that of the commission when substantial evidence on the record as a whole supports a finding. We are not obliged, however, to "rubber-stamp ... affirmance of administrative decisions ... inconsistent with a statutory mandate." *NLRB v. Brown*, 380 U.S. 278, 291, 85 S.Ct. 980, 988, 13 L.Ed.2d 839 (1965). When statutory compliance is at issue, we must look to the purpose behind the statute to determine if the commission has properly interpreted the words of the statute. *United States v. Ozark Air Lines, Inc.*, 374 F.Supp. 234 (E.D.Mo.1974).

The intent of the legislature in enacting Chapter 203, Air Conservation, is stated in § 203.030:

It is the intent and purpose of this chapter to maintain purity of the air resources of the state to protect the health, general welfare and physical property of the people, maximum employment and the full industrial development of the state. The commission shall seek the accomplishment of this objective through the prevention, abatement and control of air pollution by all practical and economically feasible methods.

To accomplish that objective, the legislature required, in the mandatory language of § 203.075–3, that the commission determine present levels of air quality in the vicinity of a proposed facility before deciding whether or not to grant a permit.

The cases consistently hold that the term "vicinity" does not express any definite idea of distance. *Schmidt v. Kansas City Distilling Co.*, 90 Mo. 284, 2 S.W. 417 (1886). We cannot say, then, that to be "in the vicinity" of a source, a monitor must be within a certain number of yards or even miles. Nor do we intend to say that monitoring is the only method by which the statutory obligation can be fulfilled or that monitoring cannot be combined with modelling or other techniques. We can say, however, that if monitoring is used by the commission to satisfy the statutory directive, it must have a reasonable likelihood of measuring air truly representative of that which it is required to monitor—ambient air in the vicinity of the source. We

recognize that neither statutes nor regulations can dictate what the ideal position must be for proper measurement in every case. But we also recognize that *in this case*, the air in the vicinity is affected by gravel roads. The fact that the monitor used is the closest to the site does not mean that it necessarily accomplishes the objective which the statute contemplates, when that monitor is offered to show general background throughout a large area of rural Missouri rather than concentrations created by an existing source of emissions (gravel roads) in the vicinity of a proposed, additional source. The record shows no evidence that the Civil Defense monitor measured air that once drifted across the Franklin County quarry site or its vicinity, or even that it measured air affected by the same type of contaminants. Testimony by an expert that he would not expect the air at the quarry site to differ substantially from the Civil Defense site does not remedy this defect. Further, even if all parties agreed that the monitoring was done at a site identical to the site in question (to which the parties by no means agree in this case because of the absence of gravel roads at the monitoring site), all the commission would have actually determined is that the ambient air quality in the vicinity of the monitoring site, not the proposed site, does not exceed standards.

To perform its statutory duty to determine the ambient air quality in the vicinity of a proposed source of air contaminants, the commission is obliged to see that adequate monitors exist to test the ambient air throughout the state, including air in areas affected by gravel roads. As the commission acknowledges in its brief, this is a large area in Missouri. If the state's air monitoring network is inadequate to do this, the commission cannot rely on it to satisfy its duty.

We are not persuaded by the commission's contention that if local dust sources are considered in determining compliance with ambient air quality standards, "virtually no industrial growth could occur in Missouri" on account of the many gravel

roads in our rural counties. First, we are *not* holding that the commission must place monitors directly next to gravel roads or any other pollution source, but only that samplers must yield a valid measurement of the ambient air in the vicinity of the proposed source, and when gravel roads are in that vicinity, their effect must be measured.[3] Further, the commission is given great discretion in § 203.110 to grant variances when compliance with Chapter 203 "will result in an arbitrary and unreasonable taking of property or in the practical closing and elimination of any lawful business, occupation or activity . . . without sufficient corresponding benefit or advantage to the people."

Because we find that monitoring by the closest available sampler does not satisfy the statutory mandate when that sampler is not shown to yield a valid measurement of the type of emissions found in the vicinity of the source, we reverse on this ground and hold that the commission has not determined the present ambient air quality as required by § 203.075–3.

Further, both parties discuss extensively whether the exhibits show that the 24-hour average was accurately monitored—either by plaintiffs' expert, Dr. McDougal, or by the Civil Defense site monitor. Our holding above, as to the annual mean, applies as well to any 24-hour average obtained on the monitor. Even if it did not, the question is not one we can adequately review for the simple reason that no finding whatsoever appears in the commission's order on the 24-hour average of suspended particulates, contrary to statutory requirements.

We are not at liberty to infer that an administrative agency found facts in accordance with the results reached. *Century State Bank v. State Banking Board,* 523 S.W.2d 856 (Mo.App.1975). Our scope of review is limited to a determination of whether the findings are supported by competent and substantial evidence. To infer findings from the ultimate decision would defeat this limited review and allow us to find both law and facts on appeal. *Stephen & Stephen Properties, Inc. v. State Tax Comm'n,* 499 S.W.2d 798, 804 (Mo. 1973).

We do not assume, therefore, that because the commission concluded that "no violations of air quality standards in the vicinity" presently exist, it must have found a 24-hour average for suspended particulates under 150 micrograms per cubic meter. The commission must make that finding on remand and show the basis for it.

Accordingly, we hold that no substantial evidence appears in the record to support the commission's finding that ambient air quality standards—either the 24-hour average or the annual geometric mean—are not presently exceeded. The decision of the circuit court must be reversed.

B. *Anticipated impact on ambient air quality*

The commission concluded that if permit conditions are obeyed, quarry operations and the attendant truck traffic will not result in violations of ambient air quality standards. This conclusion was based primarily on testimony by DNR engineer Christa Henson that with the controls required by the permit in place, the water spray bar control system will be ninety percent effective in removing particulates released by the crushing process, watering of the on-site haul roads will be fifty to eighty-five percent effective in controlling fugitive dust emissions, and surfacing of Little Tavern and Fiddle Creek Roads will control eighty-five percent of emissions from those sources. Ms. Henson expressed her opinion that many of the remaining particulates would either be trapped by wind currents on the steep shelves of the quarry face itself, filtered out by the surrounding trees, or dispersed by the wind, so that she did not expect emissions to have an

---

**3.** In fact, as the commission points out, federal regulations require that monitors not be placed within twenty-five meters of a road. 40 C.F.R. Part 58, Appendix E, § 2.3 (1980). We can hardly choose to overrule a federal regulation. The commission is free to determine the actual placement of monitors to measure the effect of the roads without violating federal regulations.

impact on nearby residences. She concluded that the impact on ambient air quality standards would be minimal—not enough to violate the annual ambient air quality standard of sixty micrograms per cubic meter.

Plaintiffs contend that Ms. Henson's testimony does not constitute substantial evidence to support the commission's conclusion concerning the impact of the quarry on ambient air quality standards because: (1) her opinion testimony is in conflict with the factual testimony of area residents regarding the impact of prior quarry operations; (2) her analysis did not include dispersion modeling of the impact of the quarry operation and its truck traffic; (3) her testimony related solely to annual average concentrations of suspended particulates, with no mention of anticipated 24-hour levels of emissions; and (4) the testimony of CRP's expert witness, Thomas Cuscino, based on his modeling of fugitive emissions from the entire operation, establishes that operation of the quarry will result in concentrations substantially in excess of 24-hour standards.

 We do not accept plaintiffs' first argument that Ms. Henson's opinion testimony is insubstantial because it is in conflict with factual testimony of area residents. Plaintiffs cite the principle that opinion evidence is without probative value when shown to be in conflict with evidence of physical facts. *Black v. Kansas City Southern Ry. Co.,* 436 S.W.2d 19, 28 (Mo. 1968) (en banc). The argument mistakenly assumes, however, a conflict in the testimony. No conflict exists because Ms. Henson's conclusions were based on the assumption that the control systems required by the permit would be in place, while the testimony of area residents concerned the

dust that resulted from earlier quarry operations when no controls were used.

Nor do we find that Ms. Henson's testimony is weakened by her failure to include dispersion modeling of the impact of quarry operation.[4] The commission specifically found that "[n]o air dispersion modeling techniques exist to predict with any degree of accuracy the impact ... on air quality in the vicinity of the proposed source." Plaintiffs challenge this finding both on the basis that Ms. Henson was admittedly not an expert in this area and on the basis of testimony by their expert, Mr. Cuscino, that modeling could project emissions within twenty to fifty percent of actual monitoring.

We find these arguments unpersuasive.

 Although Ms. Henson admitted modeling was not within her field of expertise, she offered her opinion as to whether adequate models existed for the terrain involved in this case. Whether her testimony on this matter was credible is not a matter for this court to decide. The determination of credibility of witnesses is a function of administrative tribunals. *Edmonds v. McNeal,* 596 S.W.2d 403, 408 (Mo.1980) (en banc). Because the tribunal is in the best position to judge the demeanor and conduct of witnesses before it, we must defer to that finding.[5] *Phelps v. Metropolitan St. Louis Sewer Dist.,* 598 S.W.2d 163, 165–66 (Mo.App.1980). The commission, therefore, was acting within its discretion in finding the testimony of Ms. Henson persuasive.

 Moreover, we find ample indication in the record, based on the disagreement between Ms. Henson and Mr. Cuscino and on testimony regarding the uncertainties of

---

4. Modeling refers to the use of complex algebraic equations (models) to project the anticipated impact of emissions from a not-yet-existing source on present concentrations of pollutants in the atmosphere. The formulas take into account such data as the quantity and rate of emissions, wind direction and speed, atmospheric stability, geographic conditions, and other factors. *See* Sullivan and Shanoff, *Air Quality Assessments: Dispersion Modeling,* TRIAL, December, 1981, at 50–3.

5. We remind the commission that § 536.090, requiring administrative agencies to make findings of fact and conclusions of law has been interpreted in *Century State Bank v. State Banking Board, supra,* to include determinations "as to what part of the evidence it will believe and find to be true and what part it will reject." *Id.* at 859. On remand, the commission is advised to make determinations as to which of the conflicting expert reports before it are accepted as true.

modeling by Six Flags' expert Harvey Shell, that modeling is an inexact science. The experts here disagreed as to the reliability of the method for use with fugitive emissions on uneven terrain. Mr. Shell testified, "there are too many variables, too many things that happen, to advise on fugitive particulates." We cannot say, then, as a matter of law, that existing models are clearly so accurate that the commission had no basis for finding otherwise.[6] We must defer to the expertise of an administrative agency in reaching decisions based on technical and scientific data. *Smithkline Corp. v. FDA,* 587 F.2d 1107, 1118 (D.C.Cir.1978); *Cayman Turtle Farm, Ltd. v. Andrus,* 478 F.Supp. 125, 131 (D.C.Cir.1979).

▮ Furthermore, at the time Six Flags received its permit the statute did not specify the means by which future impact must be determined.[7] § 203.075–3. An agency has reasonable latitude concerning what methods and procedures to adopt in carrying out its statutory obligation. *Natural Resources Defense Council, Inc. v. Nuclear Regulatory Comm'n,* 539 F.2d 824, 838 (2d Cir.1976), *vacated for mootness,* 434 U.S. 1030, 98 S.Ct. 759, 54 L.Ed.2d 777 (1978). We cannot say, therefore, that the use of a method of analysis other than modeling was per se improper.

▮ Plaintiffs next argue that Ms. Henson's testimony does not provide substantial evidence to support a conclusion that quarry operation will not exceed air quality standards because no mention is made in her report of anticipated 24-hour levels of emissions. We agree and accordingly reverse on this additional ground. As we have seen, 10 C.S.R. 10–6.010 sets standards for both annual and 24-hour averages. Section 203.075–3 requires that the impact of proposed sources on those standards be determined.

Ms. Henson's report does not support— nor did she claim it supports—any finding relative to 24-hour averages. Her testimony shows that while she did calculate *hourly* emissions, her report did not calculate *24-hour* emissions. She testified that she made the 24-hour calculations based on maximum capacity of the crushing operation, but that she did not include those figures in her report. We have no indication of what those figures revealed.[8]

We hold that the commission upon remand must determine the impact of the proposed quarry on 24-hour averages before the permit can be granted.

▮ Plaintiffs also contend that Mr. Cuscino's testimony establishes that the quarry will result in concentrations of suspended particulates in excess of the 24-hour standards. His testimony, however, related only to emissions which will result from unpaved and unwatered roads. We agree with the commission that his testimony is flawed by his failure to consider the effect that watering of the haul roads, as required by condition No. 2, will have on these concentrations.

---

**6.** Apparently, modeling currently allows only a rough analysis of complex terrain. We note the following admonition from Sullivan and Shanoff, *Air Quality Assessments: Dispersion Modeling,* TRIAL, December, 1981 at 50–3: "[M]odeling ... works best when applied to flat terrain. *While models exist to simulate* flow through complex terrain, do not place too much confidence in the results. Mountainous areas, *valleys* and coastlines *are typical of areas which* create complex flows that *are difficult to simulate*" (emphasis added).

**7.** 10 C.S.R. 10–6.060(3)(B)—4A and 9A, effective April 11, 1980, now require an applicant to "provide modeling data to demonstrate that potential ... emission increases ... will not cause or contribute to ambient air concentrations in excess of any ambient air quality standard ..." and to base all estimates and analyses *of ambient concentrations on the applicable* air quality models specified in the "Guideline on Air Quality Models" (OAQPS 1.2–080, U.S. Environmental Protection Agency). These regulations were not in force on July 25, 1979, the date Six Flags was issued a permit.

**8.** Mr. Shell's testimony *did* address a daily emission rate, but he acknowledged that he considered only emissions from the crushers, not fugitive emissions. Mr. Shell was retained by Six Flags specifically to consider the company's compliance with federal Prevention of Significant Deterioration regulations. The regulations at that time did not require consideration of fugitive emissions.

■ The commission argues as well, however, that we must "presume that Franklin County will act in a responsible manner and allow the roads to be paved" as required by condition No. 4. We disagree. If such an assumption could be made, the amendment of condition No. 4, making it contingent on approval of county authorities, would have been entirely unnecessary. Because the condition specifically provides that if the county denies permission to pave the roads, the permit will be granted anyway, before it can adequately assess what the effect will be, the commission must upon remand include in its findings a determination of the impact unpaved roads will have on air quality standards.

In view of Mr. Cuscino's failure to include the effects of watering the haul roads in his report and our inability to judge the credibility of the witness, we cannot say as a matter of law that his report must be accepted by the commission as conclusive on the issue of the impact of haul traffic on the ambient air quality. We instruct the commission on remand, however, to include specific findings of the impact that operation of the quarry will have on air quality standards if the roads are not paved.

■ This instruction not only applies to the 24-hour average, as testified to by Mr. Cuscino, but to the annual mean, testified to by Ms. Henson. As we noted earlier, her testimony assumed that all control systems would be in place. Because of the very real possibility that the "control" of paved roads will not be in place, a determination of the effect they will have on both 24-hour averages and the annual mean must be made.

Accordingly, we hold that the record shows substantial evidence to support a finding that the annual geometric mean for anticipated ambient air quality standards will not be exceeded by the proposed facility, if all imposed conditions are observed. Because the record shows no finding, however, on the issue of the 24-hour average with controls in place, we reverse on this additional ground and direct the commission to make such a determination on remand. Further, because condition No. 4

leaves open the possibility that the "control" of paved roads will not be imposed, we direct the commission to determine on remand what effect operation of the quarry absent this control will have on both the 24-hour and the annual ambient air quality standards.

2. *Amendment of permit condition No. 4*

Condition No. 4 of the original DNR permit required Six Flags to surface those portions of Fiddle Creek and Little Tavern Roads which would be used by trucks traveling to and from the quarry site. Both are county roads, located off-site. The commission amended the condition, making the requirement contingent on approval of Franklin County authorities. Nevertheless, Six Flags was authorized, even if that approval was not obtained, to operate using the unpaved roads, subject only to the other permit conditions.

■ The power of the commission to require an operator of a proposed source of air contaminants to take certain actions on property not directly under his control cannot be seriously questioned. The commission has the authority under § 203.075–3 to deny unconditionally any permit where air standards will be violated. If the commission chooses instead to give the applicant the opportunity to avoid any violations by paving off-site roads, such an action cannot be attacked on the basis that it, in essence, both denies the permit if local authorities do not allow the required action and denies the applicant the right to operate. The legislature plainly intended that the commission may deny that right if the effect on air quality standards requires denial.

Plaintiffs argue nevertheless that the amendment of condition No. 4 was unlawful because: (1) the commission failed to give any reason for its action; (2) the commission made Six Flags immune from the legitimate authority of Franklin County; (3) the condition as modified would allow Six Flags to operate an emission source in violation of ambient air quality standards; (4) the commission improperly delegated to the Franklin County authorities the respon-

sibility of deciding whether to permit such violations; (5) the condition would require Franklin County to assume responsibility for maintaining the surfaced roads without full state financing, in violation of the Missouri Constitution (Hancock Amendment).

■ We find condition No. 4 to be unlawful as amended, but only for the reasons argued in plaintiffs' points one and three.

When the commission amended condition No. 4, the reason given was that without the amendment, the condition "is unreasonable as written, and will unduly prejudice Six Flags." Plaintiffs' first sub-point is that no finding of fact appears on the record to explain and support this conclusion of unreasonableness. The commission points to its finding that the roads involved are public roads over which the commission has no direct control and argues that this finding gives adequate reason for concluding that the original condition was unreasonable.

We disagree with the commission. Because as we have stated, the commission unquestionably has the authority to deny the permit outright, we do not see how a condition to the permit which merely makes the denial possible is *necessarily* unreasonable. Accordingly, in conjunction with plaintiffs' third sub-point, *infra,* we reverse on this ground and hold that on remand, the commission must give full reasons for its findings of unreasonableness, as required by § 536.090 and *Century State Bank v. State Banking Board, supra.*

As to plaintiffs' second sub-point, however, we find that the amended condition in no way makes Six Flags immune from the authority of Franklin County. Franklin County remains free to grant or deny Six Flags' request to pave the roads, just as it has always been. The commission's order does not preempt whatever lawful zoning regulations may exist in Franklin County. More importantly, the concerns advanced by plaintiffs consist of speculations as to what the county may or may not want. Such concerns belong only to the county itself, which is not a party to this cause.

Plaintiffs are correct in their third sub-point that the condition as modified *could* allow Six Flags to operate an emission source in violation of ambient air quality standards contrary to § 203.075–2, if leaving the roads unpaved would have that result. Accordingly, reversal is justified on this separate point. Whether or not the unpaved roads would have that result, however, has not yet been determined. As we required in 1B, Anticipated impact on ambient air quality, *supra,* the commission must include in its findings a determination of the impact unpaved roads will have on air quality standards. If the commission concludes that the result will be a violation of the standards, the condition as amended is unlawful. The commission cannot leave open the possibility that a condition to a permit may allow a violation to occur.[9]

In their fourth sub-point, plaintiffs contend that condition No. 4 constitutes an unlawful delegation to Franklin County of the commission's authority under chapter 203.

We find no merit in this contention. The commission simply has not delegated any of its powers. Both the commission and the county have exactly the same powers they had before the condition was attached. As

9. This holding is based on the fact that *in areas where air quality standards are being met,* § 203.075–2 does not permit construction of a source which would, in itself, cause air quality standard violations and, in fact, provides that where the source will not meet the requirements of relevant statutes and regulations, the commission "shall deny the permit." This is consistent with 10 CSR 10–6.060(3)(A) which provides that "[a] permit shall be issued only if it is determined that the proposed source operation or installation will not violate any of the provisions of this rule…"

This opinion is totally unconcerned with *areas in which air quality standards are already being exceeded* ("non-attainment areas"), areas which are governed by § 203.075–3 and 10 CSR 10–6.060(4). Nothing in this opinion addresses non-attainment areas and therefore, that portion of § 203.075–3 which grants the commission considerable discretion and provides that it "may deny a permit if the source will appreciably affect the air quality standards or the air quality standards are being substantially exceeded" is neither applicable nor interpreted here.

we have said, however, the condition cannot stand if it leaves open the possibility that the county's denial of permission to pave the roads may result in violation of ambient air quality standards.

■ Finally, plaintiffs argue that the condition violates the Missouri Constitution, article 10, §§ 16 and 21 (the Hancock Amendment) by forcing the county to assume responsibility for maintaining the surfaced roads without full state financing. We disagree. The amendment, approved by the voters on November 4, 1980, prohibits the state "from requiring any new or expanded activities by counties ... without full state financing ..." We do not reach the question of whether this amendment applies retroactively to the amended permit issued in May of 1980, because the amendment is simply not applicable here. On these facts, the county remains free to choose whether or not to permit the surfacing of the roads. If it chooses to deny permission, no maintenance of the roads will be required. If it grants permission, it may do so on the condition that Six Flags maintain the roads. If it does not so require, the county will be consciously choosing to maintain the roads itself.[10] Having so chosen, the county cannot be said to have been *required* to undertake "new or expanded activities."

Because condition No. 4 leaves open the possibility that a violation of ambient air quality standards may be allowed to occur if the county denies permission to pave the roads, we reverse on this separate ground and hold that absent a determination of the effect of operation of the quarry on unpaved roads, the condition is unlawful. On remand, then, the commission must make such a determination and the condition as amended may be included in the permit only if standards are not violated. Further, the commission must give a more explicit reason for its finding that the original condition was unreasonable.

10. *See* "Adequacy of condition No. 4", *infra,* where the commission concedes that mainte-

### 3. *Adequacy of condition No. 4*

Plaintiffs next contend that condition No. 4, even if mandatory, would be inadequate because it does not provide for maintenance of the county roads to be surfaced by Six Flags and does not adequately require resurfacing of all the roads involved.

■ This point is largely mooted by the commission's concession in its brief that although the word "maintained" is not used in condition No. 4, maintenance by Six Flags is implied.

Further, plaintiffs contend that the language of the condition requiring surfacing of the public roads that will be used "to transport material to and from the facility" limits the surfacing to roads used by loaded trucks and is inadequate because of failure to apply to roads used by unloaded trucks as well. The commission argues that the only reasonable interpretation of the language is that it requires surfacing of roads used by both loaded and unloaded traffic. We agree with the commission.

Finally, plaintiffs contend that by providing that "[i]n the event that the company chooses to use only one of these roads, that road chosen will be the only road requiring surfacing", the commission has overlooked the fact that Six Flags will not have control over which road drivers not in its employ will use, and therefore, both roads should be surfaced. The commission acknowledges that if, in fact, Six Flags cannot control which road is used, it must pave both.

Because of these concessions as to the intended meaning of condition No. 4, no disagreement appears to remain. We hold, therefore, that the commission must simply clarify the condition by expressly providing in it for maintenance by Six Flags and for the paving of both roads if Six Flags cannot control which road is used.

### 4. *Adequacy of condition No. 2*

Condition No. 2, requiring that "all haul roads on the company's property" be watered to prevent dust in excess of twenty percent opacity, is challenged by plaintiffs

nance of the roads by Six Flags is implied in the condition.

first on the basis that "on the company's property" does not include the western access road over which the company has an easement, and second, on the basis that the existing well on the property is inadequate to provide sufficient water to dampen the haul roads in case of a water shortage.

■ The commission makes clear in its brief that condition No. 2 is intended to apply to the entire western access road, even those portions over which Six Flags has an easement. Accordingly, the commission is directed to make this intended meaning more clear on remand, expressly applying the condition to all private access roads whether they are under lease to Six Flags or subject to an easement in the firm's favor.

As to the question of the adequacy of the well on the firm's property to provide the water needed for watering haul roads, the commission correctly points out that condition No. 2 must be interpreted to require Six Flags to comply with its terms by whatever means are necessary. It is not conditioned on use of water only from the quarry site. A water shortage would not relieve Six Flags of its obligation, but would merely require it to transport water from another source.

### 5. *Failure of the hearing officer to submit proposed findings*

Plaintiffs' fifth point charges that the commission's order is defective because the hearing officer, James L. Robinett, Jr., did not make recommended findings of fact to the commission as a whole. Section 203.-100–3(2) provides that a hearing may be held before one commission member or a hearing officer, who "shall preside at the hearing and hear all evidence and rule on the admissibility of evidence" and who "*shall* make recommended findings of fact and *may* make recommended conclusions of law to the commission" (emphasis added).

Here, Mr. Robinett indisputably made no findings. At the close of the hearing, the parties agreed that each would submit proposed findings of fact and conclusions of law, together with briefs, directly to each member of the commission. Plaintiffs argue that the failure of the hearing officer to follow the mandatory language of the statute prejudiced their right to a fair hearing, by depriving the commission of findings from an impartial hearing officer who was in the best position to weigh and assess the credibility of witnesses.[11]

■ Generally, the use of the word "shall" imposes a mandatory duty upon the official charged by statute with its performance. *State* ex rel. *Dreer v. Public School Retirement System,* 519 S.W.2d 290, 296 (Mo.1975). That is particularly true where, as here, "shall" is contrasted with the use of "may" in describing another procedure in the same statutory section. *State* ex rel. *McTague v. McClellan,* 532 S.W.2d 870, 872 (Mo.App.1976).

The commission, citing *State* ex Inf. *Attorney General* ex rel. *Lincoln v. Bird,* 295 Mo. 344, 244 S.W. 938 (1922), and *State* ex rel. *Ellis v. Brown,* 326 Mo. 627, 33 S.W.2d 104 (1930) (en banc), argues that because the findings by the hearing officer are not essential to the validity of the proceedings, the statute is directory rather than mandatory. We cannot agree that findings of fact by the hearing officer are not essential. The purpose of the hearing is to discover the truth of the matter at issue, at least as it appears to one impartial trier of fact. We cannot agree that proposed findings *by the parties* submitted directly to the commission satisfies this same purpose. In effect, such a practice means the hearing officer need find nothing at all after hearing the evidence, making the usefulness of this hearing before less than the entire commission extremely doubtful.[12]

---

11. Six Flags' contention that plaintiffs waived this point by failing to object at the hearing is of no merit. Although at the close of the hearing the hearing officer requested and the parties agreed that proposed findings be submitted to him with sufficient copies for all commis-

sioners, his intention not to make findings of his own was not apparent. Plaintiffs could hardly have objected at that time to his failure to do so later.

12. The hearing officer could, of course, have

■ Accordingly, we hold that the language of § 203.100–3(2) requiring that a hearing officer *shall* make recommended findings of fact to the commission makes such findings mandatory. Because we are reversing and remanding this case on other points, however, requiring findings of fact from the original hearing would be non-productive. On those points disposed of in this opinion, the findings would add nothing. On those points which the commission must reconsider on remand, any new evidence would render the old findings moot. Here, then, our holding requires only that if this matter is again heard by a hearing officer according to § 203.100–3(2), that officer must make recommended findings of fact to the commission on the issues before him.

### 6. Standing of Citizens for Rural Preservation (CRP)

In its conclusions, the commission denied standing to CRP without explanation. As noted earlier, CRP is a not-for-profit corporation dedicated to promoting, preserving and protecting the rural environment. To determine whether CRP had standing to seek review of the commission's decision, we look to recent celebrated U.S. Supreme Court cases.[13]

■ A voluntary membership association such as CRP may have standing in one of two ways—either (1) by seeking judicial relief from injuries to its own rights (derivative capacity) or (2) by seeking to vindicate whatever rights its members may enjoy (representative capacity). *Warth v. Seldin,* 422 U.S. 490, 511, 95 S.Ct. 2197, 2211, 45 L.Ed.2d 343 (1975). In *Warth,* the Supreme Court held:

Even in the absence of injury to itself, an association may have standing solely as the representative of its members.... The association must allege that its members, or any one of them, are suffering immediate or threatened injury as a result of the challenged action of the sort that would make out a justiciable case had the members themselves brought suit.

The criteria which must be met before an association can bring suit on behalf of its members were summarized and restated by the Court as follows: (1) the members must have standing to bring suit in their own right; (2) the interests the association seeks to protect must be germane to its purpose; and (3) neither the claim asserted nor the relief requested must require the participation of individual members in the lawsuit. *Hunt v. Washington State Apple Advertising Comm'n,* 432 U.S. 333, 343, 97 S.Ct. 2434, 2441, 53 L.Ed.2d 383 (1977).

■ The first element for representative standing—that the members have standing in their own right—unquestionably exists here. Contrary to Six Flags' assertion, CRP need not own real estate in the area of the quarry site or have a pecuniary interest in the cause in order to have standing. A showing of harm to the environmental well-being of parties seeking judicial review is sufficient. *United States v. S.C.R.A.P.,* 412 U.S. 669, 686, 93 S.Ct. 2405, 2415, 37 L.Ed.2d 254 (1973); *Sierra Club v. Morton,* 405 U.S. 727, 734, 92 S.Ct. 1361, 1365, 31 L.Ed.2d 636 (1972).[14] CRP alleges

adopted *verbatim* the findings of fact proposed by either party and presented them as his own. This practice, frequently used by our trial courts in satisfaction of Rule 73.01(a)(2) is by no means condemned. Such an adoption would have adequately presented the hearing officer's position to the commission.

**13.** Plaintiffs direct us to *Missourians for Separation of Church and State v. Robertson,* 592 S.W.2d 825 (Mo.App.1979). This court found it unnecessary, however, to decide whether a similar entity had standing in that case.

Although the litigation efforts of corporations similar to CRP were involved in three Missouri

cases cited by plaintiffs, the issue of their standing did not arise on appeal. *Union Electric Co. v. Kirkpatrick,* 606 S.W.2d 658 (Mo. 1980) (en banc); *Missouri Farm Bureau Fed'n v. Kirkpatrick,* 603 S.W.2d 947 (Mo.1980) (en banc); *United Labor Comm. v. Kirkpatrick,* 572 S.W.2d 449 (Mo.1978) (en banc). The precedential value of those cases is, therefore, limited.

**14.** To the extent that certain language in *State ex rel. Pruitt-Igoe District Community Corp. v. Burks,* 482 S.W.2d 75, 78 (Mo.App.1972), relied upon by Six Flags, requires an economic interest, that case is incorrect and constitutes a

that its members either own property or reside in the area of the quarry site and would be adversely affected by the noise, dust and vibrations generated by the proposed quarry operation and its attendant truck traffic. This is sufficient.

Second, the aesthetic and environmental interests asserted by CRP in this matter are germane to its organizational objectives of preserving and protecting the rural environment.

Finally, neither the nature of the claim nor the relief requested requires the participation of the individual members for a proper adjudication of the issues.[15] Indeed, allowing CRP standing to protect the common interests of its members would minimize the possibility of a multiplicity of actions by individual members.

Accordingly, we reverse on this additional ground and hold that because Citizens for Rural Preservation has alleged injury in fact to its members, because the members would otherwise be able to bring suit individually, because the interests represented by the association are germane to its purpose, and because the claim does not require the participation of individual members in the lawsuit, CRP has standing to maintain an action on behalf of its members for review of the DNR's decision granting Six Flags a permit.

We reverse the judgment and remand this cause to the circuit court with directions to reverse the order of the Air Conservation Commission and to remand the cause to the commission for further proceedings consistent with this opinion.

All concur.

misinterpretation of *Sierra Club v. Morton, supra.* Two additional cases cited by Six Flags— *Lindenwood Improvement Ass'n v. Lawrence,* 278 S.W.2d 30 (Mo.App.1955) and *Citizens Against Rezoning, Inc. v. St. Louis County,* 563 S.W.2d 172 (Mo.App.1978)—requiring that a corporation own property in order to have standing, are zoning cases and must be limited to that specialized area of litigation.

**15.** Associational standing would be inappropriate, for instance, where an association is seeking not merely declaratory, injunctive or some other form of prospective relief, but damages for alleged injuries to its members. Damages would require individual participation by the association's members. *See Simer v. Rios,* 661 F.2d 655, 682 (7th Cir.1981), *cert. denied,* 456 U.S. 917, 102 S.Ct. 1773, 72 L.Ed.2d 177 (1982); *Warth v. Seldin, supra,* 422 U.S. at 515–16, 95 S.Ct. at 2213–2214.