**David MORTON, Clever Stone Company, Inc., David Donelson and Mary Ann Donelson, Plaintiffs–Appellants,**

v.

**MISSOURI AIR CONSERVATION COMMISSION, and Harriet Beard, David Crane, Johnny Ray Conklin, Andy Farmer, William Clark, Mike Foresman, Department of Natural Resources and David Shorr, Defendants–Respondents,**

**Leo Journagan Construction Company, Inc., Intervenor–Respondent.**

Nos. 20826, 20828.

Missouri Court of Appeals,
Southern District,
Division One.

March 19, 1997.

Motion for Rehearing and Transfer
Denied April 3, 1997.

Application to Transfer Denied
May 27, 1997.

Mathew W. Placzek, David E. Overby, Springfield, for Donelson & Clever Stone.

Kimberly J. Lowry, Springfield, for Appellant Morton.

John E. Price, Price, Fry & Robbs, Springfield, for Intervenor–Respondent.

BARNEY, Presiding Judge.

On August 1, 1991, the Director of the Division of Environmental Quality, within the Missouri Department of Natural Resources (MDNR), granted a permit to Leo Journagan Construction Company, Inc. (Journagan) to operate a limestone quarry and rock crushing operation on a 40 acre site located in rural Christian County, Missouri. David and Mary Ann Donelson, Clever Stone Company, Inc., (Clever Stone) and David Morton (Appellants) filed their administrative appeal with the Air Conservation Commission of the State of Missouri (Commission) to set aside the permit. Journagan intervened.[1] The Commission issued its findings of facts and conclusions of law and order confirming the decision granting the permit. Appellants then filed their petition for review of the order of the Commission with the Circuit Court of Greene County, Missouri, pursuant to § 536.100 *et seq.*, RSMo 1994. The court affirmed the order of the Commission. This appeal followed.[2]

Journagan maintains its quarry and rock crushing operation on a 40 acre tract located to the east of an existing quarry and rock crushing operation on 155 acres of land partially owned and leased by Appellants David and Mary Ann Donelson in Christian County, Missouri. Mr. and Mrs. Donelson own Clever Stone and Mr. Donelson is the President of the company. Appellant David Morton is a farmer who lives south of the Journagan quarry.

Journagan had theretofore applied for a permit for its quarry in 1986. A permit was granted in 1990, which was appealed by Appellant David Morton and others resulting in a hearing before the Commission. As a result of that hearing, a discrepancy in the north boundary line of Journagan's property was discovered which affected the permitting authority's review process and Journagan voluntarily withdrew its application. The problem with the boundary line was subsequently corrected.

On March 20, 1991, when Journagan made its latest application for authority to construct a limestone quarry, an "air contaminant" was described as: "any particulate matter or any gas or vapor or any combination thereof," and an "air contaminant

---

1. An unincorporated group composed of persons living near the proposed quarry and called the Citizens Against the Quarry, also administratively appealed the decision to the Commission. However, they are not a party to the appeal presently under consideration.

2. The Commission issued its findings of fact and conclusions of law and final determination on August 31, 1995. Appellants filed their petition for review on September 27, 1995. The order and judgment of the Circuit Court of Greene County, Missouri, confirming the decision of the Commission issued on February 16, 1996.

source" was described as: "any and all sources of emission of air contaminants whether privately or publicly owned or operated." § 643.020, RSMo Cum.Supp.1990. Therefore, a limestone quarry was considered to be an "air contaminant source" because of the dust and airborne particles raised in the course of its operation. *See* 10 C.S.R. 10–6.060(7)(B);[3] *see also Citizens for Rural Preservation, Inc. v. Robinett,* 648 S.W.2d 117, 121 (Mo.App.1982). The statute provided that it was incumbent upon the permit authority to make two key findings before it issued a permit to build or enlarge an air contaminant source.[4] It had to determine: (1) "if the ambient air quality standards[5] in the vicinity of the source are being exceeded" and (2) "the impact on the ambient air quality standards from the source." § 643.075.3, RSMo Cum.Supp.1990. The permit authority could "deny a construction permit if the source will appreciably affect the air quality standards or the air quality standards are being substantially exceeded." § 643.075.3, RSMo Cum.Supp.1990.

3. All references to 10 C.S.R. are to the following year dates: 10–6.010 (1988); 10–6.020 (1989); 10–6.040 (1988); 10–6.060 (1989); and 10–6.170 (1990).

4. Section 643.075, RSMo 1986 and § 643.075, RSMo Cum.Supp.1990, described the permit authority as the "executive secretary" of the Missouri Air Conservation Commission. § 643.075, Cum.Supp.1992, describes the "director" of the Department of Natural Resources as being the permit authority. § 643.040, RSMo.1986 provided that the "Air Conservation Commission of the State of Missouri" would be domiciled within the Missouri Department of Natural Resources (MDNR). In their briefs, all parties refer to the MDNR in connection with the issuance of a permit under the provisions of Chapter 643, RSMo 1986, the Air Conservation Act. Therefore, this opinion will make reference to the MDNR in connection with the permit process.

5. "Ambient air" is defined as "all space outside of buildings, stacks, or exterior ducts." § 643.020(7), RSMo Cum.Supp.1990. The "ambient air quality standards" referred to in § 643.075.3, RSMo Cum.Supp.1990, are found in 10 C.S.R. 10–6.010 (1988); *see also* National Ambient Air Quality Standards (NAAQS), promulgated by the United States Environmental Protection Agency (EPA), 40 C.F.R. § 50.6(a) and (b) (1987). Pursuant to § 643.055.1, RSMo

Journagan was then granted a *de minimis* permit[6] to construct and operate his quarry on the basis that Journagan's quarry would emit less than 15 tons of PM10 and 25 tons of TSP (total suspended particulates) per year. 10 C.S.R. 10–6.060(2) and (7)(A), Table 1. Additionally, the Commission added the following conditions to the permit:

(1) Production was limited to no more than 240,000 tons per year, or 960 tons per day.

(2) Emission controls included total enclosure of the secondary crusher/screening units; water spray of conveyor transfer points, primary crusher, and all haul roads; paving of all interior haul roads, including from the county road to a location as near to the truck loading sites as possible (i.e. accounting for the termination where heavier equipment traffic intersects the loadout route). Haul roads shall be watered whenever the vehicular traffic on the road is capable of producing visible emissions off the haul road.

(3) A program of post-construction/production monitoring for this installation ...

1986, the Missouri Air Conservation Commission may adopt rules and regulations to establish standards to ensure compliance with the provisions of the Clean Air Act (42 U.S.C.A. § 7401 (1995), *et seq.*). These standards limit the level of PM10 which may be emitted into ambient air to 150 micrograms per cubic meter for a 24–hour average concentration, and to 50 micrograms per cubic meter, annual arithmetic mean. "PM10" is defined as particulate matter 10 microns or smaller in diameter. 10 C.S.R. 10–6.020(2)(P)(1)(B). According to the evidence presented to the Commission, PM10 consists of microscopic particles which are present in "dust" but which behave in the atmosphere like a gas. PM10 is not visible to the naked eye. These concentrations are usually expressed as micrograms per cub meter (ug/m3).

6. A *de minimis* source permit (*see* 10 C.S.R. 10–6.060(2)) requires no modeling (mathematical formulas to predict the anticipated impact of emissions from a proposed source on present concentrations of pollutants in the ambient air) or monitoring (the actual measurement of existing concentrations of PM10 through the use of PM10 'samplers' or 'monitors' in accordance with 40 C.F.R. Part 50, Appendix J (1987); *see also* 10 C.S.R. 10–6.040(4)(J)). Only major sources which will emit more than 100 tons of a pollutant annually are required to conduct preapplication modeling and monitoring. *See* 10 C.S.R. 10–6.060(5)(A) and (C).

shall be undertaken, lasting for a period of one (1) year. Within thirty (30) days of the receipt of this permit, a monitoring Quality Assurance (QA) plan must be developed and submitted to the Air Pollution Control Program for review.

Appellants challenge the order of the Commission in the following respects. They argue that the Commission erred by: (1) not determining whether certain "fugitive dust" would leave the boundary line of Respondent's property; (2) its determination that the "ambient air quality" in the vicinity of Respondent's quarry was either at its regulatory limit or was not being exceeded at the time of the issuance of the permit; (3) concluding that the permit was "*de minimis,*" not requiring modeling and monitoring preceding the issuance of the permit; (4) and (5) failing to comply with its statutory obligations under § 643.075.3 to determine the ambient air quality in the vicinity of the quarry and its impact on the air quality in the general area; hence, the Commission's findings were not supported by competent and substantial evidence upon the whole record, were arbitrary, capricious and unreasonable, and constituted an abuse of discretion; (6) utilizing the standard of review based on "belief" of the correctness of the MDNR's action, rather than the proper standard of being based upon "competent and substantial evidence considering the whole record"; (7) engaging in unlawful procedure, without a fair trial by its failure to attend the hearings and its failure to review all exhibits and read the entire transcript as required by statute; (8) failing to reach a determination on several contested issues of fact; and (9) refusing to consider the "modeling" that the MDNR had conducted since the permit was issued, showing that air quality standards would be exceeded as a result of the quarry operation.

■ We initially take up Journagan's motion to dismiss Appellants' appeal based upon this Court's lack of subject matter jurisdiction over the cause alleged herein. Journagan contends that only the party requesting a permit has the right to appeal a decision granting or denying a permit, citing § 643.075.5, RSMo Supp.1988. Journagan's motion to dismiss is not well taken, however, and is denied. Section 643.060(4), RSMo 1986 provides that "[a]ny person aggrieved by any action of the executive secretary [of the Air Conservation Commission of the State of Missouri] under this provision shall be entitled to a hearing before the commission as provided in section 643.080." Accordingly, Appellants have the right to maintain this appeal.

■ On appeal from an agency decision in a contested case, an appellate court generally reviews the findings of fact and decision of the agency, not the judgment of the circuit court. *Clark v. School Dist. of Kansas City,* 915 S.W.2d 766, 773 (Mo.App.1996). Our review is limited to a determination of whether the decision was supported by competent and substantial evidence upon the whole record, whether it was arbitrary, capricious or unreasonable, or whether the agency abused its discretion. *Robinett,* 648 S.W.2d at 124. Substantial evidence is merely evidence which, if true, has probative force upon the issues, i.e., evidence favoring facts which are such that reasonable men may differ as to whether it establishes them. *Clark,* 915 S.W.2d at 773; *see also Robinett,* 648 S.W.2d at 124. Where the evidence before an agency would warrant either of two opposing conclusions, we are bound by the agency's findings. *Robinett,* 648 S.W.2d at 124. While we may not substitute our judgment for that of the agency, we must ascertain whether the agency could have reasonably made its findings and reached its result upon consideration of all the evidence before it. *Id.* If the findings and conclusions of the agency are clearly contrary to the overwhelming weight of the evidence, we must reverse or order further appropriate action. *Id.* The determination of a witnesses' credibility is the function of the administrative tribunal. *Weber v. Firemen's Retirement Sys.,* 899 S.W.2d 948, 951 (Mo.App.1995). We defer to the expertise of an administrative agency in reaching decisions based on scientific and technical data. *State v. Missouri Resource Recovery, Inc.,* 825 S.W.2d 916, 931 (Mo.App.1992). If the agency's interpretation of a statute is reasonable and consistent with the language of the statute, it is entitled to considerable deference. *Id.*

However, when an administrative agency's decision is based on the agency's interpretations of law, the reviewing court must exercise unrestricted, independent judgment and correct erroneous interpretations. *Burlington Northern R.R. v. Director of Revenue,* 785 S.W.2d 272, 273 (Mo. banc 1990).

■ In their first point, Appellants argue that the Commission erred in refusing to determine whether or not "fugitive dust" would leave the boundary line of the property which was the subject of the permit. They argue that under the provisions of 10 C.S.R. 10–6.170 the Commission received no evidence showing that Journagan's operation could comply with the requirements of the regulation and urge that the decision of the Commission must be reversed and remanded for a finding on the issue of Journagan's ability to comply with 10 C.S.R. 10–6.170. Appellants therefore assert that the Commission erred when it refused to receive evidence in the form of offers of proof relating to a video showing dust emissions crossing Journagan's property line and statements by a MDNR employee that the provisions of 10 C.S.R. 10–6.170 were not considered by the MDNR before the granting of Journagan's permit.

On the other hand, Journagan argues that 10 C.S.R. 10–6.170 is not a "permitting" regulation at all but rather a future enforcement regulation. Journagan contends that the language presupposes that a permit has already been issued and this is the interpretation given the regulation by the MDNR and the Air Conservation Commission. In either event, Journagan contends that the matter was addressed by the Commission when it asserted in its permit that the provisions of 10 C.S.R. 10–6.170 were applicable to this facility and that Journagan must comply with the provisions.

The pertinent provisions of 10 C.S.R. 10–6.170 read as follows:

10 CSR 10–6.170 Restriction of Particulate Matter to the Ambient Air Beyond the Premises of Origin

*PURPOSE: This rule restricts the emission of particualte matter to the ambient air beyond the premises of origin.*

(1) Restrictions to Limit Fugitive Particulate Matter Emissions.

(A) No person may cause or allow to occur any handling, transporting or storing of any material; construction, repair, cleaning or demolition of a building or its appurtenances; construction or use of a road, driveway or open area; or operation of a commercial or industrial installation without applying reasonable measures as may be required to prevent, or in a manner which allows or may allow, fugitive particulate matter to go beyond the premises of origin in quantities that—

1. The particulate matter remains visible in the ambient air beyond the property line of origin; or

2. The particulate matter may be found on surfaces beyond the property line of origin. The nature or origin of the particulate matter shall be determined by microscopy or other technique proven to be equally accurate and approved by the director.

(B) Should the director determine that the conditions of (1)(A)1. or 2. have occurred at a location the director may require reasonable measures, as may be necessary, to curtail particulate matter from going beyond the premises of origin of the occurrence. . . .

The regulation in question speaks in terms of certain fugitive particulate matter emissions arising from the "handling, transporting or storing of any material; construction, repair, cleaning or demolition of a building or its appurtenances; construction or use of a road, driveway or open area." On the other hand, 10 C.S.R. 10–6.060 regulates the granting of a permit to construct and operate a source wherein a specifically identified pollutant is generated. It can, therefore, be concluded that "fugitive particulate matter emissions," as defined by 10 C.S.R. 10–6.170, makes reference to particulate matter eminating from sources not otherwise covered by other regulations governing output of specifically identified pollutants. Therefore, 10 C.S.R. 10–6.170 can better be described as a regulation which controls ancillary, particulate matter, emitted by the handling, transporting, cleaning, demolishing, repairing and

operating of a commercial or industrial enterprise, wherein particulate matter emissions may remain visible in the ambient air beyond the property boundary or are found on surfaces beyond the property boundary. *See* 1 Mo. Environmental Law, § 7.71 (MoBar 1991, 1992).

"Common example[s] of a fugitive particular emission source [are] a construction or demolition site. At such construction or demolition sites, the operator must apply all reasonable measures required to prevent fugitive particulate matter from becoming airborne and either visible beyond the property where it originates or found beyond the property where it originates. MoDNR can require the operator to take dust control measures to prevent this fugitive emission problem." 1 Mo. Environmental Law, § 7.71 (MoBar 1991, 1992). Therefore, 10 C.S.R. 10–6.170 appears to be an added tool given to the director in order to control particulate matter emissions in the ambient air and on surfaces beyond the property line of origin, both in cases where a permit to operate a contaminant source may have been granted, and in *ad hoc* operations where a permit has not been granted.

■■■■ In interpreting statutes and rules, the same principles of construction are used. *Woolridge v. Woolridge*, 915 S.W.2d 372, 378 (Mo.App.1996). Words used are given their plain and ordinary meaning. *Weston Point Resort Condominium Owners' Ass'n, Inc. v. Floro*, 796 S.W.2d 928, 930 (Mo.App.1990). The regulation has a provision which states at 10 C.S.R. 10–6.170(1)(B) that "[s]hould the director determine that the conditions of (1)(A)1. or 2. *have occurred* at a location the director may require reasonable measures, as may be necessary, to curtail particulate matter from going beyond the premises of origin of the occurrence." The regulation then goes forward with a list of potential revisions. BLACK'S LAW DICTIONARY 1080 6th ed. (1990) defines "occur" as, "[t]o happen ... to present itself ... to befall in due course; to take place; to arise." Therefore, to "have occurred" denotes the past tense, that the matter has happened or has taken place. It can then be concluded that the regulation speaks to a matter that may

take place in the future and what the director may do if such a condition might occur. This appears to be the interpretation given the regulation by the Commission.

■■■■ We are not aware of any authoritative appellate interpretation of 10 C.S.R. 10–6.170. In such a case, the effect the agency accords the administrative promulgation assists the court of review. *Crudup v. Missouri State Div. of Family Servs.*, 600 S.W.2d 129, 130 n. 2 (Mo.App.1980). For purposes of an offer of proof the parties stipulated that Sharon Turpin, the engineer who drafted Respondent's permit and who was employed by the MDNR, would testify that she knew of "no investigation conducted into this issue ... [procedures discussed in 10 C.S.R. 10–6.170] and these investigations [relative to 10 C.S.R. 10–6.170] are not conducted under any circumstances *with respect to any permit*, that this is just something that is not done...." The permit specifically states that the provisions of 10 C.S.R. 10–6.170 would apply to the facility in question and the Commission approved of the permit and all of its provisions. This necessarily lends credence to the interpretation that under the particular fact circumstances of this case 10 C.S.R. 10–6.170 does not constitute a prerequisite to the granting of a permit, but rather comes into play once the permit has been granted. It can, therefore, be concluded that the regulation's requirements are prospective in application. "Deference to the agency action is even more clearly in order when interpretation of its own regulation is at issue." *Missouri Resource Recovery*, 825 S.W.2d at 931. Having determined that 10 C.S.R. 10–6.170 is not a prerequisite to permit regulation, all other stated subpoints are rendered irrelevant. Point one is denied.

■■■■ In their second point Appellants argue that the Commission erred in its determination that the ambient air quality in the vicinity of Journagan's quarry was either at its regulatory limit or was not being exceeded at the time of the issuance of the *de minimis* permit. Appellants contend that MDNR knew that the air over Appellant Clever Stone's operation surpassed the NAAQS for PM10 and that Journagan's proposed operation would result in a significant

increase in the PM10 reading. However, Appellants take the position that Clever Stone had never violated the NAAQS, nor had admitted that it had violated any air standards relating to its operation on its properties. Appellants ingeniously complain that if MDNR was convinced that NAAQS standards were being violated by Clever Stone, Journagan's operation, in either event, would significantly contribute to the violation of the air standards and that MDNR therefore abused its discretion in granting the permit.

The key question therefore is to determine whether on the record the Commission had substantial and competent evidence upon which to base its decision granting the permit. *Robinett*, 648 S.W.2d at 124.

The evidence showed that computer modeling of air emissions utilized models developed by the EPA, (in this case, ISC or Industrial Source Complex models) which attempt to predict concentrations of air pollutant at selected locations based upon assumptions and information about emission rates of pollutants from the source being modeled. The precise input data to be fed into the model involves engineering judgment.

Sharon Turpin testified that the permit was issued based on modeling data generated by Journagan's previous application. The data showed no violations of the NAAQS for PM10. She testified that she was not aware of any information which would call into question the validity of the model. She then recommended that certain controls be put in place, heretofore mentioned, and that if the controls were applied, there would be no violations of the air quality standard.

In connection with Journagan's application of 1986, because its proposed operation was so near to Appellant's operation, MDNR ordered that monitoring be conducted near the site areas, under authority granted MDNR by 10 CSR 10–6.060(4), although not required for the purposes of the issuance of a *de minimus* permit (*see* 10 CSR 10–6.060(2)(A)). James Shissler, an experienced meteorologist working with MDNR directed the placement of the monitors and monitoring was conduct-ed between October 1987 and February 1989. On the basis of this monitoring data, a model was then created which showed that at a maximum production level of 960 tons per day, the Journagan quarry would not exceed the NAAQS for PM10 on either an annual mean or a 24 hour average basis.

Evidence in the record showed that a 100 foot high, natural wall created a vertical barrier between Appellant's operation at the bottom and Journagan's operations above the high wall to the east. Also, Appellant's operation was located in a north/south valley and the foregoing, in combination with the high wall, tended to channel winds north and south rather than east and west so that Appellant's and Journagan's emissions would not be added together to create PM10 concentrations. The physical features of the sites and the meterological conditions tended to channel Appellant's emissions away from the Journagan property so they would not cumulatively impact other areas. Additionally, in 1990 Appellant Clever Stone added certain water sprays and partial enclosure on part of its crushing plant equipment in response to a notice of violation from MDNR for violation of the air pollution laws. Experts Rick Rostek, Chris Smith and Dr. Ku all testified without contradiction that Clever Stone's PM10 emissions would be reduced if these types of controls were put in place, even if Clever Stone had increased production between 1988 and 1991, as actually occurred (Clever Stone's production increased from 130,000 tons in 1988 to 180,000 tons per year in 1991).

Roger Randolph, the Director of the Air Pollution Control Program, wrote in December of 1994 that the air quality standards in the area of the Journagan and Clever Stone operations were being exceeded. However, in later testimony during the hearing before the Commission, Mr. Randolph stated that his opinion had changed because his 1994 opinion was based upon certain computer modeling of the quarries performed by Chris Smith. Mr. Smith, however, acknowledged in his testimony before the Commission that his modeling contained various uncertainties.[7] Further, at the time of his written

---

7. Based upon problems with input data, as brought out by Journagan's experts, Mr. Smith

remarks in 1994, Mr. Randolph testified that he had never reviewed any actual air monitoring results from the quarries. Therefore, Mr. Randolph's subsequent testimony before the Commission was to the effect that he did not know if NAAQS standards were being exceeded. He then testified that he relied on the judgment of his staff regarding whether to issue the permit in 1991 and that he considered his staff reliable. The permit was subsequently issued.

Dr. Calvin Ku of MDNR's technical staff testified that based on air monitoring data on the sites, conducted between 1987 and 1989, there were no NAAQS violations at the time the 1991 permit was being considered for Journagan. He stated that he had seen no data which convinced him that there were violations of the NAAQS for PM10 either on a 24-hour basis or an annual mean basis. He also indicated that at the time and prior to the issuance of the permit, he had no information which would have led him to believe that violations of the NAAQS were occurring. Dr. Ku also testified that there were minor errors in modeling, but no major problems. Further, although Dr. Ku agreed that the MDNR would not presently (1995) issue a permit without additional monitorial data, he disagreed that the NAAQS at the time of the hearing were being violated at the site and stated that there was no direct proof of any violation. He then stated that he found the permit in question to be "one of the best permit[s] we ever issued with all the control requirements."

While criticism exists in the record relative to the Shissler model, particularly dealing with the placement of one of the monitors and the initial over-reporting of PM10 emissions, the Commission found that the Shissler model was substantially reliable. It concluded that the over-reporting of the PM10 emissions was partially based on outdated (1979) meterological data, which was subse-

quently corrected. Further, when Dr. Ku cross-checked the results of the Shissler model against actual air monitoring results, Dr. Ku found that the model erroneously over-predicted PM10 concentrations. Indeed, the record shows that not only the Shissler model but all subsequent modeling data contained certain inherent inaccuracies because of the inability of the models to consider the complex terrain within which the two sites are situated. We must defer to the expertise of an administrative agency in reaching decisions based on scientific and technical data. *Missouri Resource Recovery*, 825 S.W.2d at 931. Where the evidence before the Commission could warrant either of two opposing conclusions, the Commission's findings must be upheld. *Pulitzer Publ'g Co. v. Labor and Indus. Relations Comm'n*, 596 S.W.2d 413, 417 (Mo. banc 1980). We, therefore, conclude that there was competent and substantial evidence based on the whole record to support the Commission's decision. *Robinett*, 648 S.W.2d at 124. Point denied.

■ In their third point, Appellants argue that the Commission erred in concluding that the permit was *de minimis* because there was no evidence in the record that Journagan's quarry, when operational, would emit less than 25 tons of TSP per year (a condition of a *de minimis* permit); the analysis of anticipated PM10 made by the Commission was based on a flawed model and, therefore, its computation that PM10 was projected to be less than 15 tons per year was flawed; and no competent and substantial evidence supported the Commission's conclusions. Appellants' third point lacks merit.

In 1991, a facility which produced less than 15 tons per year of PM10 and 25 tons per year of TSP was classified as *de minimis*. 10 C.S.R. 10-.060(7)(A); 10 C.S.R. 10-

acknowledged that his models of the quarries operations were inaccurate and very likely over-predicted PM10 emissions from the Clever Stone operation. Mr. Smith went on to state that he would not be able to state to a reasonable degree of scientific certainty that violations of the NAAQS exist along the common property boundary between Clever Stone and Journagan's quarries, without re-running his models with more

accurate data. The evidence presented to the Commission during the hearing showed that MDNR's Model 5A, the only model based on 1991 conditions at the quarries, exhibited no violations of PM10 standards. Further, none of the models predicted concentrations outside the two quarries' boundaries which approached 150 ug/M3 PM10.

6.060(2). Indeed, a *de minimis* permit was subject to a streamlined review process, exempt from preconstruction monitoring or modeling. 10 C.S.R. 10–6.060(2)(A). Further, under authority given him by 10 C.S.R. 10–6.060(3)(B)(4), the director could require "additional information, plans, specifications, evidence, documentation, modeling or monitoring data ... to complete his ... review under this rule." Only major sources which would emit more than 100 tons of a pollutant annually were required to conduct preapplication modeling and monitoring. 10 C.S.R. 10–6.060(5)(A). The requirement of one year's preconstruction air monitoring applied only to major facilities. 10 C.S.R. 10–6.060(5)(C)(1)(C).

Based on its initial emission inventory questionnaire (the EIQ) Journagan provided basic information to MDNR regarding the proposed amount of rock to be generated by its proposed quarry operation. Sharon Turpin performed the necessary calculations to determine whether a *de minimis* permit would be applicable. Her calculations included both PM10 and TSP rates of emissions. She made specific findings that PM10 emissions from the Journagan facility would amount to 12.22 tons per year. After application of controls, the PM10 emissions were reduced to 9.83 tons per year, being less than the *de minimis* levels. Therefore, she concluded that the permit would be reviewed under the *de minimis* regulation. She testified that she considered TSP in her calculations and after applying a higher TSP percentage than she normally used, she concluded that it would "still make this a *de minimis* source."

It was Dr. Ku's opinion that the Shissler model indicated that the NAAQS would not be exceeded if the permit were issued. *See* discussion of point two, *infra.* Appellants have not shown the Commission's findings to be contrary to the overwhelming weight of the evidence. *Robinett,* 648 S.W.2d at 124. Point three is denied.

In point four Appellants argue that the Commission erred in granting the permit because it did not fulfill its obligation under § 643.075.3, RSMo Cum.Supp.1990, to determine the ambient air quality in the vicinity of the source and its impact on the air quality from the proposed source. This point is largely a reiteration of its prior Points Two and Three, *infra,* and the point will be denied. MDNR, in the exercise of its discretion, chose not to require new monitoring data when Journagan made its 1991 application. Appellants' own expert, Mr. Rostek, acknowledged that new monitoring wasn't a prerequisite to the issuance of the August 1991 permit and wasn't required either by law or regulation for a *de minimis* permit. *See* 10 C.S.R. 10–6.060(2)(A), 10 C.S.R. 10–6.060(7)(A), 10 C.S.R. 10–6.010 and 40 C.F.R. 50.6(a), (b). As pointed out in footnote 5, *infra,* these ambient air quality standards referred to in § 643.075.3, RSMo Cum.Supp. 1990, are found in 10 CSR 10–6.010 and are based on NAAQS promulgated by the EPA, 40 C.F.R. 50.6(a)(b), pursuant to the Clean Air Act (42 U.S.C.A. § 7401, *et seq.*); *see also* 40 C.F.R. Part 50, Appendix K. Suffice to say, Dr. Calvin Ku, Chief of MDNR's technical support section, testified that the 1987–1989 monitoring data was still representative of the site conditions when the Journagan permit was granted in 1991. Both Ms. Turpin and Dr. Ku approved of the Shissler model and Dr. Ku concluded that the Shissler model, if anything, overstated the PM10 emissions but that it was largely an accurate model. Dr. Ku then determined that the NAAQS would not be exceeded. The Commission noted the foregoing in its decision and further noted "that the controls to be placed on the Journagan operation should be sufficient to prevent any violations of the air quality standards based both upon the air monitoring and the modeling done at that time." Point denied.

In their point five, Appellants contend that the Commission's findings are not supported by competent and substantial evidence, are arbitrary, capricious and unreasonable and constitute an abuse of discretion because (1) monitoring data upon which MDNR relied was not adequate and representative of the conditions existing at the time the permit was granted; (2) monitoring "was not done with sufficient frequency to be adequately representative of the conditions existing at the time the permit was granted; (3) the

monitors were not properly placed . . .; and (4) the model upon which MDNR and the Commission relied was flawed. . . ."

██  In review of subpoint (1) of Point Five, Appellants erroneously suggest that 10 C.S.R. 10–6.060(5)(C)(1)(C) would control the manner in which the Journagan site was to be monitored and further argued that the air monitoring data should have been gathered over a period of one year.

However, the cited regulation has no application to the Journagan permit, since by its terms the regulation applied only to major PSD sources; see Ambient Monitoring Guidelines for Prevention of Significant Deterioration, promulgated by the EPA, 40 C.F.R., Part 51.[8] As previously mentioned, MDNR's calculations, based upon quarry production of 240,000 tons of rock per year and the stringent pollution controls placed on the operation, found that the PM10 emissions from Journagan's operation would emit 12.22 tons of contaminant per year, not 100 tons per year. Although PSD major sources guidelines were initially used to locate monitor sites, Mr. Shissler and Mr. Shell exercised engineering judgment in picking precise locations. These locations were based on concerns of security, access to electricity and avoidance of obstructions and vegetation which may have affected the monitoring efforts. Appellants' expert, Mr. Rostek acknowledged that MDNR had discretion regarding the placement of the monitors and agreed there was no abuse of discretion in selecting the monitor locations because their placement involved good engineering judgment. The Commission also noted that

> None of the experts who testified stated that the manner in which the air quality monitoring was done was not in accordance with good engineering practice, although some of the experts would have conducted the modeling differently. Appellants' contention that the monitoring was required to be conducted in accordance with PSD monitoring guidelines is contrary to the law when dealing with a de minimis

source permit and contrary to the testimony of their own experts.

██  Lastly, Appellants argue that using the 1987–1989 data overlooked Clever Stone's increased production, which would have adversely impacted the ambient air. However, the facts show that in 1990 Clever Stone had installed pollution control devices on its equipment in response to a violation notice from MDNR. Dr. Ku testified without contradiction that Clever Stone's PM10 emissions would be reduced if controls on its equipment were in place, even if it had increased production between 1988 and 1991. Journagan's expert, Charles Shell testified that PM10 emissions from Clever Stone would have been reduced from the time of the initial monitoring until August 1991 due to the addition of water sprays to its equipment. The determination of a witnesses' credibility is the function of the administrative tribunal. Weber, 899 S.W.2d at 951. Where the evidence before an agency would warrant either of two opposing conclusions, we are bound by the agency's findings. Robinett, 648 S.W.2d at 124. There is sufficient and competent evidence to support the Commission's conclusions that increases in Clever Stone's quarry production did not cause the 1987–1989 air quality monitoring relating to PM10 emissions to become outdated or inaccurate at the time the 1991 permit was granted. Subpoint denied.

In its second subpoint, Appellants contend that because of the infrequency of monitoring and the failure to follow the requirements of 10 C.S.R. 10–6.040(K) and 10 C.S.R. 10–6.060(5)(C)(1)(C), the monitoring conducted was not representative of the existing quality of the air in the vicinity of the Journagan site. The foregoing regulations, however, apply to PSD major sources with the potential to emit more than 100 tons of pollutant a year. As explained heretofore, the Journagan permit is not in this category and the foregoing regulations and their federal counterpart do not apply; a fact acknowledged by Appellants' own expert, Mr. Rostek.

8. Facilities which have the potential to emit more than 100 tons of a regulated pollutant are subject to the stringent prevention of significant deterioration (PSD) regulations. See 10 C.S.R. 10–6.060(4).

The original south monitor location at the Journagan site was moved after two high readings were obtained during October 1987. Expert testimony showed that monitors are not to be placed near roads or areas of disturbed vegetation because the monitor would tend to pick up excessive amounts of PM10 generated from the road or disturbed area, hence the reading would become inaccurate and not truly reflective of the background. The monitors had been placed near the construction of Journagan's proposed entrance road and the dust from the area distorted the monitor readings. Once the monitors were moved, regular monitoring occurred for a period of over a year. Dr. Ku testified that the 1987 to 1989 monitoring data was representative of the site conditions when the Journagan permit was granted in 1991. Subpoint two is denied.

█ In their third and fourth subpoints Appellants argue that the monitors were not properly placed and that the model upon which MDNR and the Commission relied was flawed.

As mentioned previously, PSD guidelines regulate the positioning of monitors for the purposes of determining PM10 emissions in the granting of permits other than *de minimis* sources. However, expert engineering testimony at the hearing indicated that the guidelines were used as a starting point in the placement of monitors but that their location would be adjusted in the field depending upon the discretion of the agency. This necessarily involves engineering judgment, as Mr. Rostek, Appellants' expert testified. Mr. Shissler, Dr. Ku and Journagan's experts agreed that good engineering judgment was used to place the monitors. The Commission found that the "placement of the monitors was designed to reflect the area of greatest PM10 concentrations on the Journagan property, even after the south monitor was moved" and the "monitoring was performed in accordance with good engineering practice and that the monitored data which was properly utilized did not show any exceedences of allowable PM10 levels." The technical finding of the Commission is entitled to considerable deference. *Missouri Resource Recovery*, 825 S.W.2d at 931.

█ With regard to the alleged flawed model, while Dr. Ku testified that there were minor errors in the modeling, he also stated that these flaws did not represent any major problems. Sharon Turpin testified that she was not aware of any information which would call into question the validity of the Shissler model.

While the model reflected two high readings in October 1987, as explained previously, it was determined that these high readings arose from nearness of the monitoring device to a road construction source. The monitors were subsequently moved, to more accurately reflect the detection of PM10 emissions from the primary quarry source. A third high reading which took place on April 27, 1988, was described as an "outlier," likely caused by a lime spill on the road along Journagan's property. It was, therefore, removed from the calculation as not being a consistent representation of PM10 emissions, according to Mr. Shissler. It should be noted that Appellant presented no expert witness who testified that the foregoing, three anomalous readings were in any way representative of site conditions generally.

While differences of opinion were exhibited relating to other facets of the monitoring process, there was substantial expert testimony that the Shissler model was reasonably accurate and within the bounds of normal modeling accuracy. Expert testimony presented at the hearing generally conceded that modeling is an inexact science which has substantial uncertainties and limitations, such as the inherent limitation of being based on "flatland" modeling, which assumed that both quarries were essentially on the same level of topography, which they were not. Both Journagan's expert, Mr. Shell and Dr. Ku of MDNR testified that because of its inability to account for these complex terrain features, the ISC model (EPA approved Industrial Source Complex Model) which was run on the two quarries, predicted higher concentrations of PM10 on Journagan's property than really existed as a result of the Clever Stone operation.

Expert testimony at the hearing also supported the proposition that modeling is a

predictive process and if both modeling and monitoring results are available the monitoring data should be followed. Consequently, no perfect model of the two quarry sites was available. The Commission found that the Shissler model was reasonably accurate, particularly in conjunction with the actual monitoring results from the site. Subpoints are denied. Point denied.

Appellants' sixth point of error is a recapitulation of its prior points. Essentially Appellants argue that the Commission's decision was based on a "belief" that MDNR's granting of the Journagan permit was proper, rather than being based upon competent and substantial evidence. The primary inquiry before this Court is a determination as to whether the Commission had before it competent and substantial evidence to support MDNR's decision in August of 1991 to grant the Journagan permit. Without repeating the discussions relating to Points Two through Five, we determine that there was substantial and competent evidence in support of the Commission's determination herein. *See Robinett,* 648 S.W.2d at 124; *see also Barnes Hosp. v. Missouri Comm'n on Human Rights,* 661 S.W.2d 534, 537 (Mo. banc 1983). Point denied.

■ In Appellants' seventh point, they argue that the Commission's findings were made upon unlawful procedure, without fair trial and in excess of statutory authority because the Commission did not attend the hearing and failed to review all exhibits and read the entire transcript. This point has no merit.

While the record appears to be devoid of a showing that any member of the Missouri Air Conservation Commission attended the administrative hearing, nevertheless, the Commission complied with its statutory duties. Section 643.100.3(2), RSMo Cum. Supp.1992, provides that except for hearings to promulgate rules:

> [H]earings may be held before one commission member designated by the commission chairman or by a hearing officer who shall be a member of the Missouri bar and shall be appointed by the commission. The hearing officer or commission member shall preside at the hearing and hear all

evidence and rule on the admissibility of evidence. The hearing officer or commission member shall make recommended findings of fact and may make recommended conclusions of law to the commission.

The record shows that the Commission designated Ms. Evelyn Mangan to be the hearing officer. She held extensive evidentiary proceedings, involving thousands of pages of testimony and dozens of exhibits. Our review of the transcript shows that the hearing officer performed this task in an expert and professional manner.

■ Appellants contend that the Commission members did not review the transcript and exhibits in the case. They cite to occasional typographical errors and incomplete recitations of various witness testimonies, in attempting to infer that the Commission did not carry out its duties. Appellants, make no concrete showing, however, of any direct evidence in the record substantiating their claim that the Commission failed to review the transcript and the exhibits.

We note that the transcript shows that the parties appeared before the Commission on July 26, 1995. At that time the chairperson of the Commission made the following statement:

> We do have—I have in my bag all of the evidence that was presented—and I can't promise that we read every single word, but I can tell you that we are very familiar with your case.

On the same day, the Commission's attorney, Ms. Woods, stated that the matter:

> is now submitted to the Commission and they will be reading the transcript and considering the exhibits.

We conclude that Appellants' claim that the Commission has failed to review the exhibits and transcript herein prior to making their findings of facts and conclusions of law, and their determination, very largely rests on surmise and speculation. Their claim is not supported by the record or any other competent evidence. Point denied.

In Point Eight, Appellants contend that the Commission did not perform its duties in reaching a determination as to various contested issues of fact relating to MDNR's movement of the south monitor and the conducting of monitoring, and regarding the efficacy of the Shissler model and its design value. These issues have been addressed in previous points and need not be reiterated. Additionally, Appellants argue that the Commission erred in summarily dismissing all post-permit modeling as not being adequately reflective of conditions at the time the permit was issued. However, Chris Smith of MDNR, who performed the modeling, acknowledged that the modeling was substantially inaccurate and likely over-predictive of PM10 emissions from the Clever Stone operation.[9] The Commission found that the air monitoring and modeling performed by MDNR accurately characterized and measured the ambient air conditions at the site. This technical finding is entitled to considerable deference. *Missouri Resource Recovery*, 825 S.W.2d at 931. The Commission's findings are supported by competent and substantial evidence upon the whole record. *See Robinett*, 648 S.W.2d at 124. Point denied.

In its final point, Appellants contend that the Commission erred in refusing to consider the modeling that MDNR conducted since the permit was issued in making its decision affirming the granting of the Journagan permit. Suffice to say the Commission exercised its discretion in discounting the post-permit modeling because the MDNR employee who ran the models acknowledged that they were inaccurate, as heretofore discussed. Expert testimony showed that the Shissler modeling, although containing minor errors, indicated that the NAAQS would not be exceeded if the Journagan permit were to be issued. Therefore, considering the entire record, there was competent and substantial evidence supporting the Commission's decision granting the permit. *See Robinett*, 648 S.W.2d at 124. Point denied.

9. There is evidence in the record suggesting that many of the errors relating to Mr. Smith's modeling arose from Clever Stone's refusal to supply him with requested information about its quarry.

The judgment of the circuit court affirming the decision of the Missouri Air Conservation Commission is affirmed.

GARRISON and PREWITT, JJ., concur.

This then led to Mr. Smith's assumptions and guess work regarding the location of roads and various activities on Clever Stone's property.