**SCOTT TIE COMPANY, INC.,**
Petitioner–Appellant,

v.

**MISSOURI CLEAN WATER COMMISSION, Respondent–**
Respondent.

No. 21534

Missouri Court of Appeals,
Southern District,
Division Two.

June 1, 1998.

Motion for Rehearing or Transfer Denied
June 22, 1998.

Application for Transfer Denied
Aug. 25, 1998.

Christina L. Kime, L. Dwayne Hackworth, Hackworth, Kime & Bowles, L.L.C., Piedmont, for petitioner-appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Kara L. Johnson, Asst. Atty. Gen., Jefferson City, for respondent-respondent.

BARNEY, Judge.

Scott Tie Company, Inc. (Scott Tie) appeals from the judgment of the Wayne County Circuit Court affirming the final decision

of the Missouri Clean Water Commission (Commission) denying Scott Tie's application for a "general permit" for storm water discharge and requiring it instead to obtain a "site specific permit." The decision to deny Scott Tie's application was initially made by the Missouri Department of Natural Resources (MDNR) which was then affirmed by the Commission. The Commission's decision was brought before the circuit court upon judicial review as provided by sections 536.100 to 536.140 and 644.071.[1]

## I.

The record shows that Scott Tie is engaged in the business of treating lumber for use as railroad ties. It has been operating in Wayne County, Missouri, for approximately twenty years. Scott Tie's current owners purchased and began operating Scott Tie in 1988.

Scott Tie injects each railroad tie it treats with creosote,[2] a wood preservative. Scott Tie uses creosote to kill living organisms and to prevent rot and decay of wood. The companies that purchase railroad ties from Scott Tie often purchase 10,000 ties at a time.

When the current owners purchased Scott Tie in 1988, a main concrete drip pad had been constructed. However, there was no roof over the drip pad nor concrete aprons that aided in catching the drippage resulting from the operation. In February 1992, upon recommendation of an engineer and an official of the MDNR's regional office in Poplar Bluff, the current owners poured concrete aprons around the drip pad and built a roof over the drip pad and dedicated a forklift to the treatment building.

Prior to the construction of the concrete drip pad, the treated ties were stored directly on the ground, with no roof. Scott Tie's president, Mr. Junior Flowers, testified that it is no longer possible for storm water to get on the drip pad and run off and contaminate the surrounding soil and creek.

The record further reflects that when the treated ties are ready for use, Scott Tie either ships them out directly or transfers them to a storage yard. However, while the treated railroad ties are in storage, awaiting shipment to customers, they are placed directly on the ground surface and are not covered.

## II.

In 1972, the United States Congress passed the Clean Water Act, which mandates that a permit be obtained when discharging water that has any amount of contamination in it.[3] Nationally, the permit is called a National Pollutant Discharge Elimination System (NPDES) permit. In Missouri, it is called a Missouri State Operating Permit. *See* 10 CSR 20–6.200(1)(A). Permits contain certain requirements and may have limits on pollutant amounts discharged to the waters of the state.

During the 1970s and 1980s, the United States Environmental Protection Agency (EPA) addressed the most threatening and visible discharges, such as process waste waters that left industrial plants from pipes and municipal sanitary sewage that received inadequate treatment before being discharged. However, the EPA's regulations did not address or regulate storm water discharges.

Beginning in the 1970s, environmental groups challenged the absence of storm water discharge regulations from the federal statutory scheme. Studies showed that over fifty percent of pollution in waters through-

---

1. All statutory references are to RSMo 1994.

2. Creosote is the most widely used wood preservative in the United States. Creosote does not occur naturally in the environment but it can be released to water and soil through its use as a wood preservative. Creosote is usually a heavy, oily liquid that is typically amber to brown in color. Mixtures of creosote and other coal-tar products are black. The creosote found at hazardous waste sites is most often a black, heavy liquid. It burns easily, but does not dissolve readily in water. U.S. Department of Health &

Human Services, *Toxicological Profile for Creosote* 1.1,(Dec.1990)(Exhibit 20 in the Legal File).

3. Much of the following historical data were taken from the MDNR's Technical Bulletin on storm water discharges. *See* Technical Bulletin of the Missouri Department of Natural Resources (Water Pollution Control Program, Permits Section), *The Storm Water Issue.* The MDNR's Technical Bulletin was identified as Exhibit 21 in the Legal File.

out the United States was the result of storm water runoff. In 1987, the federal Clean Water Act was amended to include the regulation of storm waters.

In 1974, The EPA delegated authority for the NPDES permitting program to the MDNR. This means that although the federal government oversees and reviews what the department does, it is the state that issues and enforces the permits. Under this authority, Missouri has promulgated its own storm water regulations and permitting program. *See* 10 CSR 20–6.200.

Under state regulations enacted in August 1992, a Missouri State Operating Permit is required from the MDNR for certain sites for storm water runoff.

Overall, the law addresses pollution in rain water runoff that is discharged from certain industrial sites, construction sites, and urban storm sewers. In Missouri, storm water permitting requirements are regulated in two ways: (1) general permits, and (2) "site specific" permits. *See* 10 CSR 20–6.200(5).

When applicable, a general permit is written to cover industries identified as needing permits. General permits require facilities to manage their own practices in a way that is beneficial to the environment and to Missouri streams. *See* 10 CSR 20–6.200(5)(A). "Site specific" permits may be written for a business that stores toxic materials or large amounts of potential contaminants on site that are exposed to rainfall, requires close monitoring, or is one of a few of its kind in the state.[4] *See* 10 CSR 20–6.200(5)(A)(4); *see also* Technical Bulletin, *supra* note 3.

### III.

In November 1991, Scott Tie submitted an application to the MDNR to obtain a general permit for storm water discharge. On September 14, 1992, Scott Tie responded to the MDNR's request for additional information and provided a corrected application and a new map with a more accurate description. On February 2, 1993, Scott Tie received a "Warning Letter" from the MDNR, in which the MDNR informed Scott Tie that its application for a general permit was denied. In the same letter, the MDNR informed Scott Tie that it needed to submit an application for an individual operating permit, or as referred to by the parties, a site specific permit. In its letter, the MDNR stated that "[d]epartment staff have determined that the firm's site would not be adequately controlled by a general permit due to the quantity and nature of pollutants present and that the storm water discharge may be a significant contribution of pollutants to the receiving waters."[5]

Scott Tie filed its notice of appeal of the MDNR's decision with the Missouri Clean Water Commission on September 17, 1993.[6]

The appeal was heard by a hearing officer for the Commission on September 6, 1994, and on March 7, 1995. The hearing officer filed his suggested findings of fact and conclusions of law on August 28, 1995. On September 13, 1995, the Missouri Clean Water Commission reviewed the hearing officer's suggestions and adopted them, affirming the decision of the MDNR. On October 6, 1995, Scott Tie filed its petition for judicial review of the Commission's final decision in the Wayne County Circuit Court. Scott Tie also filed a motion to remand the case to the Commission for consideration of additional evidence on February 26, 1996. The circuit court denied Scott Tie's motions and affirmed the Commission's final decision in its judgment and order entered on January 21, 1997.

On appeal to this Court, Scott Tie assigns four points of error. First, it maintains that the circuit court erred in refusing to remand the case to the Commission for consideration of new and additional evidence regarding other, similarly situated wood treaters, which

---

4. Throughout the briefs and the record, the parties and the MDNR refer to this permit as a "site specific permit." The Code of State Regulations refer to this kind of permit as an "individual operating permit." *See* 10 CSR 20–6.200(5)(A)(4).

5. The "receiving waters" of pollutants from Scott Tie's facility is Doe Run Creek in Wayne County, Missouri.

6. Scott Tie maintains that to obtain and operate under a site specific permit would be much more of a financial burden on Scott Tie than it would be to operate under a general permit.

would have established that the MDNR's decision to deny its general permit application was arbitrary, capricious, and unreasonable. Second, it argues that the Commission erred in affirming the MDNR's decision denying the general permit because Scott Tie was singled out for disparate treatment due to a personal vendetta waged against it by the MDNR. Third, Scott Tie avers that the Commission erred in affirming the decision of the MDNR because the MDNR's decision to deny its application was arbitrary, capricious and unreasonable in that the findings of the Commission that Scott Tie would have violated two conditions of the general permit were unsupported by competent and substantial evidence upon the whole record. Fourth, Scott Tie argues that the Commission erred in affirming the decision of the MDNR because the decision was arbitrary, capricious and unreasonable in that the MDNR's conclusion that Scott Tie's work site was contaminated by creosote and that Doe Run Creek would be better protected by a site specific permit was unsupported by competent and substantial evidence upon the whole record.

■ On appeal from an administrative agency decision in a contested case, we review the findings and decision of the agency, not the judgment of the circuit court. *Morton v. Missouri Air Cons.Comm'n,* 944 S.W.2d 231, 236 (Mo.App.1997). Our review is limited to a determination of whether the decision was supported by competent and substantial evidence upon the whole record, whether it was arbitrary, capricious or unreasonable, or whether the agency abused its discretion. *Id.; see also Jerry-Russell Bliss, Inc. v. Hazardous Waste Mgmt. Comm'n,* 702 S.W.2d 77, 78–9 (Mo. banc 1985). While we may not substitute our judgment for that of the agency, we must ascertain whether the agency could have reasonably made its findings and reached its result upon consideration of all the evidence before it. *Id.* If the findings and conclusions of the agency are clearly contrary to the overwhelming weight of the evidence, we must reverse or order further appropriate action. *Id.*

■ The determination of credibility of the witnesses is a function left solely to the administrative tribunal. *Morton,* 944 S.W.2d at 236. We also defer to the expertise of the agency in reaching conclusions based upon scientific and technical data. *Id.* In reviewing an administrative agency decision, the evidence is viewed in its entirety together with all legitimate inferences therefrom, in a light most favorable to the agency. *Hammack v. Missouri Clean Water Comm'n,* 659 S.W.2d 595, 597 (Mo.App.1983).

## IV.

In Scott Tie's first assignment of error, it asseverates that the circuit court should have remanded this case to the Commission for consideration of new and additional evidence, which would have established that the agency decision to deny its general permit application was arbitrary, capricious, and unreasonable.

■ "In cases involving agency discretion, the circuit court may remand the case back to the agency if additional evidence is presented which could not have been produced earlier or had been improperly excluded." *Soward v. Mahan,* 926 S.W.2d 138, 143 (Mo.App.1996)(citing § 536.140.4); *see also Greene County Concerned Citizens v. Board of Zoning Adj. of Greene County,* 873 S.W.2d 246, 254 (Mo.App.1994).

■ Here, the administrative action taken by the agency in determining whether to issue a general permit to Scott Tie was discretionary. *See* 10 CSR 20–6.200(5)(A)(1)(E). We review a circuit court's decision to not remand a case to an agency pursuant to section 536.140.4 under an abuse of discretion standard. *See Nenninger v. Department of Soc. Serv.,* 898 S.W.2d 112, 116 (Mo.App. 1995).

Scott Tie maintains that this case should have been remanded to the Commission because Scott Tie discovered the existence of a similar "wood treatment" facility, i.e., Sikeston Creosoting, in Scott County, Missouri, after the conclusion of the agency hearing and the Commission's final decision. Scott Tie argues that Sikeston Creosoting is a similarly situated business that treats railroad ties with creosote and that Sikeston Creosoting was granted a general permit by

the MDNR for storm water discharge. Scott Tie suggests that this evidence would have established that the agency decision to deny it a general permit was arbitrary, capricious, and unreasonable. We determine that Scott Tie's first point has no merit.

During the proceedings before the Commission's hearing officer conducted on March 7, 1995, we note the following colloquy during Scott Tie's cross-examination of an MDNR official:

Q. Every other wood treater in the state of Missouri had a general permit, though, until this case got started, didn't it?

A. As far as I know, they have a general permit because they are not dealing with creosote.

Q. There's also another creosote plant in *Sikeston, Missouri,* isn't there?

A. I'm not aware of that.

Q. Maybe you should be. You haven't heard of a Scott creosoting plant in *Sikeston, Missouri?*

A. The name is familiar but—

Q. Have you heard of *Sikeston Creosote* in *Sikeston, Missouri?*

A. No, I have not.

(emphasis added).

■ The testimony elicited by Scott Tie clearly indicates that Scott Tie was aware of the existence of Sikeston Creosoting in Sikeston, Missouri, before the conclusion of the second hearing on March 7, 1995.[7] Scott Tie therefore had the opportunity to develop its evidence relating to Sikeston Creosoting's storm water discharge permit at the time of the proceedings before the Commission through appropriate discovery procedures. However, the record is silent as to any discovery sought by Scott Tie specifically relating to Sikeston Creosoting prior to the March 7, 1995, hearing.[8]

The trial court found the following in its judgment and order:

[Scott Tie] contends that because there was another creosote wood treatment plant in Sikeston that was afforded a general permit and same was not disclosed by [the MDNR], that said information warrants remand. This Court disagrees. There could be other undisclosed creosote treaters in Missouri now operating under a general permit and same does not warrant remand. The hearing officer and the Clean Water Commission had before them information that Kerr–McGee creosote operation in Springfield had been required to obtain a site specific permit. [Scott Tie] was not the first to be required such permit and the fact that other such operators have not yet been required to obtain site specific permits does not in and of itself warrant remand due to being arbitrary, capricious or unreasonable. * * * [T]he Court find[s] that the additional evidence proffered by [Scott Tie] is not competent or material evidence such as to alter the decision of the Commission necessitating remand.

Scott Tie has failed to present any plausible arguments or legal authority as to why the information regarding Sikeston creosoting could not have been obtained earlier and presented to the Commission during its proceedings. *See Soward,* 926 S.W.2d at 143. The record clearly refutes Scott Tie's assertion that it was unaware of the existence of Sikeston Creosoting before the conclusion of the proceedings before the Commission. The trial court did not abuse its discretion in not remanding this case to the Commission for consideration of additional evidence. *See Nenninger,* 898 S.W.2d at 116. Point denied.

## V.

In Scott Tie's second assignment of error, it avers that the Commission erred in affirming the MDNR's decision denying Scott Tie's application for a general permit because the

---

7. The record shows and it is conceded by Scott Tie that Sikeston Creosoting did not apply for a permit until October 28, 1994. Further, the record shows that MDNR received the permit application on November 3, 1994, more than a month subsequent to the first hearing in this matter.

8. In response to a discovery request by Scott Tie, the MDNR supplied Scott Tie with a listing of wood treatment facilities with a general permit, dated August 31, 1994. Sikeston Creosoting was not on the list. However, as heretofore set out, Sikeston Creosoting made its application for a general permit *after* August 31, 1994.

undisputed evidence compelled a finding that Scott Tie was singled out for disparate treatment by the MDNR as a result of a personal vendetta waged against Scott Tie by the MDNR.

We will not disturb the agency decision unless it was arbitrary, capricious, or unreasonable. *Morton*, 944 S.W.2d at 236.

Scott Tie specifically alleges that Mr. Kevin Mohammadi, an environmental specialist for the MDNR, was the individual most vocal in denying Scott Tie's application for a general permit. Scott Tie states in its brief that "[a]lthough [Mr. Mohammadi] is not involved in the development, writing or issuance of stormwater permits, he took a great interest in Scott Tie Company's application and, in fact, caused it to be 'red flagged' and participated in a meeting with Mr. [Nick] Di Pasquale, Mr. [Karl] Frett and [Mr.] Jim Penfold to discuss this particular permit application." Following this meeting involving Mr. Mohammadi, Scott Tie maintains that its application was denied.[9]

In our review of Scott Tie's assignment of error, we initially note that the record indicates that the decision to deny Scott Tie's application was made by Mr. Di Pasquale, the director of the Water Pollution Program, not Mr. Mohammadi. We also note that the record indicates when the decision to deny Scott Tie's application was made, the information available to the MDNR consisted of (1) requests for enforcement action against Scott Tie made by the MDNR's Poplar Bluff Regional Office, (2) a number of samples taken from the receiving streams conducted by the MDNR and the EPA, which indicated creosote contamination in the soil and in the sediment, and (3) complaints from downstream property owners.

We note the record indicates that Kerr–McGee, located in Springfield, Missouri, also uses creosote in its treatment of wood, and that while initially Kerr–McGee was allowed to operate under a general permit, the ▮MDNR has subsequently required that it obtain a site specific permit.

▮ Scott Tie failed to identify any wood treating facility in Missouri that uses creosote and that has *documented* soil contamination that is currently operating under a general permit for storm water discharge. We determine that Scott Tie's assertion that it was treated disparately from all other wood treaters in Missouri is not supported by the record but appears to largely rest on "surmise and speculation." *See Morton*, 944 S.W.2d at 244. As further set out in our discussions of the remaining points below, there is competent and substantial evidence supporting the Commission's decision requiring Scott Tie to obtain a site specific permit.

In the Commission's findings of fact and conclusions of law, it found:

> As to the argument that [Scott Tie] was singled out, I think this is just a circumstantial argument. There was no evidence in the record to indicate that other wood treaters were the subject of enforcement actions at the time they applied for their general permits nor was there any evidence in the record of any water contamination at their facilities at the time their general permit applications were being reviewed.
>
> Subsequent information gathered by the [MDNR] merely supports its decision. If their subsequent information had been contrary to the information that the [MDNR] had available in February of 1993, then its decision to deny the general permit would be questionable. However, since it is consistent with the information they had in February of 1993, it supports the [MDNR's] position, albeit after the fact.

Based on our thorough review of the entire record, we are unable to conclude that Scott Tie was singled out for disparate treatment by Mr. Mohammadi or the MDNR. There was substantial and competent evidence before the Commission to indicate that the soil

9. Scott Tie also maintains that despite the fact that Mr. Mohammadi's job was to enforce permits after their issuance by the MDNR and not to decide whether a general permit should be issued, in the "Warning Letter" from the MDNR dated February 2, 1993, Scott Tie was advised that any questions concerning the denial of Scott Tie's general permit application should be directed to Mr. Mohammadi.

between Scott Tie's facility and Doe Run Creek was contaminated with creosote and that Scott Tie was the only source of creosote contamination in Doe Run Creek. *See Morton*, 944 S.W.2d at 236. Such evidence supports the Commission's findings and its decision to require Scott Tie to obtain the more restrictive site specific permit. *See id.*; 10 CSR 20–6.200(5)(A)(4). Point denied.

## VI.

We review Scott Tie's third and fourth assignments of error conjunctively, since they involve similar allegations of Commission error.

In its third assignment of error, Scott Tie avers that the Commission erred in affirming the decision of the MDNR because the evidence did not support the agency finding that Scott Tie would have violated two conditions of the general permit for storm water discharge. Lastly, Scott Tie argues that the Commission acted arbitrarily, capriciously and unreasonably by concluding that Scott Tie's work site was contaminated by creosote and that Doe Run Creek would be better protected by a site specific permit because these conclusions were unsupported by competent and substantial evidence.

In reiteration, we observe that our standard of review "is limited to a determination of whether the decision was supported by competent and substantial evidence upon the whole record, whether it was arbitrary capricious or unreasonable, or whether the agency abused its discretion." *Morton*, 944 S.W.2d at 236.

In the Commission's findings of fact and conclusions of law, it found:

8. The storm water regulation[s] state[s] that the [MDNR] can require a site specific permit if the storm water discharge is not in compliance with the conditions of the general permit. 10 CSR 20–6.200(5)(A)(4)(D) and 10 CSR 20–6.010(13)(C) 2. Page 2 of the general permit for wood treaters includes at least two conditions that [Scott Tie] would have violated. (Exhibit 9).

9. First, the general permit contains a requirement which states that discharges shall not cause violations of the general criteria in the water quality standards 10 CSR 20–7.031(3).

10. The second permit condition which would have been violated by [Scott Tie] is effluent limit 2 which states "chemicals currently used in process–2.5 times the quantification level set by standard methods." (Exhibit 9).

As to the general permit requirement regarding Water Quality Standards, we note that 10 CSR 20–7.031 provides, in pertinent part, the following:

(3) General Criteria. The following water quality criteria shall be applicable to all waters of the state at all times including mixing zones. No water contaminant, by itself or in combination with other substances, shall prevent the waters of the state from meeting the following conditions:

(A) Waters shall be free from substances in sufficient amounts to cause the formation of putrescent, unsightly or harmful bottom deposits or prevent full maintenance of beneficial uses;

(B) Waters shall be free from oil, scum and floating debris in sufficient amounts to be unsightly or prevent full maintenance of beneficial uses;

(C) Waters shall be free from substances in sufficient amounts to causes unsightly color or turbidity, offensive odor or prevent full maintenance of beneficial uses;

(D) Waters shall be free from substances or conditions in sufficient amounts to result in toxicity to human, animal or aquatic life. . . .

10 CSR 20–7.031(3).

As previously set out, Mr. Kevin Mohammadi testified that the MDNR's Poplar Bluff Regional Office received four of five complaints from property owners downstream from Scott Tie that the water in Doe Run Creek was discolored, contained unsightly sediment, and odor. Mr. Mohammadi testified that based on the MDNR's investigations, it took the position that Scott Tie's creosoting operation was in violation of 10 CSR 20–7.031(3)(A), *supra*, because the water in Doe Run Creek downstream from

Scott Tie was not free from substances (i.e., creosote) that caused the formation of unsightly and harmful bottom deposits that negatively impacted the beneficial uses of Doe Run Creek. According to Mr. Mohammadi, the beneficial uses of Doe Run Creek that were negatively impacted by Scott Tie's creosote operation included drinking water supply, irrigation, wildlife protection, whole-body-contact, recreation, protection of aquatic life, human health protection, and fish consumption. *See* 10 CSR 20–7.031(1)(C).

Ms. Connie Van Dyke is the environmental section chief of chemical analysis section of the MDNR. She testified that creosote is a mixture of chemical compounds, a byproduct of petroleum after the distillation of gasoline, fuel oil, and diesel. It is essentially a petroleum residue that consists of two general classes of chemical compounds: poly nuclear aromatic hydrocarbons (PAH), and phenolic. Ms. Van Dyke stated that PAH is a dangerous compound and a known carcinogen. She testified that water samples taken from Doe Run Creek, the receiving stream of storm water discharge from Scott Tie's facility, detected "relatively consistent levels" of PAH. She stated that it is rare to detect levels of PAH from water samples taken from Missouri streams and that PAH does not occur naturally. Perhaps most significantly, Ms. Van Dyke testified that no levels of PAH were detected upstream from Scott Tie's facility, only downstream. She stated that the PAH chemical is not soluble in water.

Regarding the second main chemical component of creosote, phenolic, Ms. Van Dyke testified that levels were detected upstream and downstream. She stated that phenolic contamination in water can come from saw dust and that there are lumber companies located upstream from Scott Tie. However, she stated that the levels detected downstream from Scott Tie were much higher. The effect of phenolic in water is that it lowers pH levels and creates a toxic environment for life.

Scott Tie presented expert testimony from Dr. Dennis Degner. Dr. Degner is a professional, environmental engineer. His testimony generally contradicted Ms. Van Dyke's conclusions regarding the contamination level of Doe Run Creek. Dr. Degner testified that the MDNR's testing methodology was flawed and that it was detecting levels of the chemical compounds of creosote at levels lower than the EPA says you can detect them. However, Dr. Degner did not take and analyze any water samples from Doe Run Creek. Dr. Degner's conclusions were based on his review of the MDNR's tests and reports. As heretofore noted, the determination of credibility of witnesses is a function left solely to the administrative tribunal. *Morton,* 944 S.W.2d at 236.

Mr. Randy Crawford is an aquatic biologist and is the supervisor of the water quality monitoring unit for the MDNR. He prepared a report entitled Acute Toxicity Testing prepared from water testing performed at Doe Run Creek. The testing was conducted on February 23, 1993, and the written report was prepared on March 17, 1993. Mr. Crawford explained that "acute toxicity" relates to the adverse effects that chemicals have on life. He stated that acute toxicity also means "survival," the ability for aquatic life to survive over a forty-eight to ninety-six hour period. *See also* 10 CSR 20–7.031(1)(A).

Part of the testing involved taking water samples from Doe Run Creek and placing in the water samples fathead minnows and ceriodaphnia. Within five to ten minutes, the animals began to die due to low pH levels in the water samples. Within thirty minutes, all of the testing organisms were dead.

Although Mr. Crawford's tests reveal that the pH level was negatively affected by Roberts Pallets, a saw mill operation located upstream from Scott Tie's site, he further stated that Scott Tie's operation also negatively impacted the pH level of the adjacent water at Doe Run Creek. Additionally, Mr. Crawford testified as to the difference in appearance of the water samples taken upstream of both Roberts Pallets and the Scott Tie operation.

Upstream of both facilities the water sample was very clear and odorless, no suspended material. The sample above Scott Tie, but below Roberts Pallets, was "kind of a murky brown in color. It had a smell of sawdust." However, the sample below Scott

Tie was "very black and had an odor, a stronger odor of sawdust." Further, there was a "a greater suspended material in the sample below Scott tie than in the sample collected below Roberts Pallets."[10] Mr. Crawford testified that in his opinion, the water in Doe Run Creek was toxic to aquatic life and in violation of the Clean Water regulations. *See* 10 CSR 20–7.031.

The second general permit requirement that the agency determined Scott Tie would violate and which Scott Tie challenges in this appeal, is the quantification level of effluent limitations.[11] *See also* § 644.041; 10 CSR 20–7.031(3).

Ms. Van Dyke further testified that a "quantification level is an experimentally derived value that is laboratory and instrument dependent. It is defined in the industry as the amount of contaminant that can be detected with 99 percent confidence that it is an accurate and acceptable value." On direct examination by the agency, we note the following colloquy between Ms. Van Dyke and the agency's counsel regarding the detection of creosote compounds in Doe Run Creek:

Q. In your opinion ... has Scott Tie exceeded the effluent limit of 2.5 times the quantification level set by standard methods under the method used in your lab?

A. Based on our experimentally derived detection and quantification limits, yes, they have.

Q. Have they exceeded that limit on just one occasion?

A. On several.

Q. And is it just for one particular component?

A. No. It was for several different PAH's.

Q. Could you give me some specific examples where that limit has been exceeded by Scott Tie?

. . . .

A. September 10th of '92. * * * Sample 92–4467, phenanthrene was above our quantification limit, well above. Fluoranthene was above. On sample 92–4468, fluoranthene, phenanthrene and pyrene were all above our quantification limits.

. . . .

On samples collected September 23 of '92, Sample 92–4490, phenanthrene was above our quantification limit. Fluoranthene was right at the limit, but it didn't really exceed it.

Sample 92–4491, phenanthrene would have been in violation. Sample 92–4497, phenanthrene would have again been in violation.

Samples collected November 19th of '92, naphthalene would have been in violation. Sample 92–4589, naphthalene would have been in violation. Phenanthrene would have been a violation on that same sample. Sample 92–4590, naphthalene would have been a violation. Phenanthrene would have been a violation.

Samples collected February 23rd of '93, naphthalene was a violation, acenapthene and phenanthrene. And then I don't have the results of the more current samples.

Q. Connie, is it your testimony that at different times and for different compounds Scott Tie has been in violation of the effluent limits set out in the general permit?

A. Yes.

■■■ Additionally, we note that the EPA performed a "multi-media inspection" of Scott Tie's facility on December 1, 1993. This report was entitled "Report of Water Compliance Sampling Inspection." The EPA collected a water sample (Sample 004) from Doe Run Creek "just downstream of [Scott Tie's] creosote treatment building." In this

10. Nowhere in the record does it indicate that Roberts Pallets utilizes creosote in its operations.

11. The Missouri General Permit for storm water discharge, relative to effluent limitations, provides in pertinent part, the following:
   *Effluent Limitations*
   The runoff from wood treaters shall not exceed:

1. Oil and Grease—20 mg/l.
2. Chemicals currently used in process—2.5 times the quantification level set by standard methods.
3. Chemicals used in the past five years— monitoring requirement only for all chemicals used.

sample, the EPA detected levels of phenanthrene, acenaphthene and fluoranthene in the water, chemical compounds of creosote. The findings in the EPA's report are consistent with the findings offered in evidence by the MDNR.[12] The EPA stated in its report:

> Based on the relative location of the creosote operation to Doe Run Creek and the finding of creosote components just downstream of the operation, it appears that creosote is reaching the creek. The mechanism for transporting creosote components to the creek is unclear as is the source or sources of the creosote. No visible flow or direct release of creosote from the operation was seen. The ground was very muddy and soft and had been heavily flooded in the month prior to the inspection. It is believed that any creosote deposits that might have been on the stream bottom would have been washed away since the bottom is rocky and the flooding was intense. *There is a high potential for subsurface seepage to the creek. There exists a potential for past management practices to result in creosote being in the soil around the treatment site and the subsurface movement of water from this area transporting the creosote components to the creek.* * * * It appears that some movement of creosote components to Doe Run Creek from the property of Scott Tie is occurring. * * * It can be discerned, both visually and by laboratory test, that the water in the vicinity of Scott Tie and Doe Run Valley Wood Products is unsightly and contains components of creosote.

(emphasis added).

In the Commissions findings of fact and conclusions of law, it found the following:

11. The [MDNR] had sufficient evidence to conclude that [Scott Tie's] site was contaminated with creosote and that Doe Run Creek, a water of the state, would be better protected by an individual, or site specific permit. Such a permit could include additional monitoring requirement rather than the one sample per year required under the general permit, as well as effluent limits and conditions unique to [Scott Tie's] site with its history of environmental problems.

12. The facts from the hearing, the stipulated exhibits and other information received into evidence, together with the testimony of the witnesses, support the [MDNR's] determination that the contamination at [Scott Tie's] site and other environmental problems dictate that the site obtain a site specific permit.

As a general rule we "defer to the expertise of an administrative agency in reaching decisions based on scientific and technical data." *Morton,* 944 S.W.2d at 236 (citing *State v. Missouri Resource Recovery, Inc.,* 825 S.W.2d 916, 931 (Mo.App.1992)). "Where the evidence before an agency would warrant either of two opposing conclusions, we are bound by the agency's findings." *Id.*(citing *Citizens for Rural Preservation, Inc. v. Robinett,* 648 S.W.2d 117, 124 (Mo.App.1982)). We determine that the Commission could have reasonably reached its findings upon consideration of all of the evidence before it. *See Morton,* 944 S.W.2d at 236. We conclude that there is competent and substantial evidence upon the whole record to support the finding by the agency that Scott Tie would have violated two of the requirements of a general permit for storm water discharge. *See id.; Hammack,* 659 S.W.2d at 600. The Commission's denial of a general permit to Scott Tie for storm water discharge was neither arbitrary, capricious, nor unreasonable. *See Morton,* 944 S.W.2d at 236, 245. Points Three and Four are denied.

The judgment is affirmed.

MONTGOMERY, C.J., and SHRUM, J., concur.

---

12. Scott Tie avers in the argument portion of its final point, *inter alia,* that the Commission should not have admitted in evidence the report prepared by the EPA. That theory of error was not set forth in Scott Tie's final point. "The questions for decision on appeal are those stated in the points relied on; a question not there presented will be considered abandoned." *Greene County Concerned Citizens,* 873 S.W.2d at 255. "Issues to which an appellant alludes only in the argument portion of the brief are not presented for review." *Id.*