**ANIMAL SHELTER LEAGUE OF THE OZARKS, INC., Appellant,**

v.

**THE CHRISTIAN COUNTY BOARD OF ADJUSTMENT and Marion Kerr as Chairman of the Christian County Board of Adjustment; Doris Deidiker, Mary Angell and Robert A. Neil as Members of the Christian County Board of Adjustment, Respondents.**

No. 22713.

Missouri Court of Appeals,
Southern District.
Division One.

July 15, 1999.

Don G. Busch, Miller & Sanford, P.C., Springfield, for appellant.

Craig A. Smith, Daniel, Clampett, Powell & Cunningham, L.L.C., Springfield, for respondents.

CROW, Judge.

Animal Shelter League of the Ozarks, Inc. ("ASL"), identifying itself as a "Missouri nonprofit corporation,"[1] applied to the Christian County Planning and Zoning Commission ("Commission") for a permit to construct and operate a "small animal shelter." Commission held a public hearing and thereafter denied the application.

ASL appealed to the Christian County Board of Zoning Adjustment[2] ("Board"), which upheld Commission's denial.

ASL then filed a "Petition for Writ of Certiorari" in the Circuit Court of Christian County.[3] That court entered judgment affirming Board's decision. ASL brings this appeal from that judgment.[4]

Christian County entitles its land use regulations as the "Unified Development Codes." For brevity, this opinion refers to the regulations as the "UDC."

An introduction to the regulatory scheme of the UDC is essential in understanding ASL's claim of error. The UDC states:

"The ... Commission has determined that traditional zoning, which divides land into broad categories of use, would not adequately meet the needs and desires of Christian County's citizens, nor would it be able to adequately respond to varied and unique development issues in different areas of the County. Therefore, the [UDC] provide[s] for a more flexible and dynamic approach to land use regulation.

A Permit System for all future development has been established. Individual proposals for development will be evaluated on the basis of established performance criteria (referred to as absolute or relative policies). The extent to which a proposed development meets the requirements of the performance criteria will be determined through a defined numerical rating system. Approval or denial of a permit for development is based on the proposed development's contributions to beneficial growth and land use patterns, compatibility with

1. Section 355.001, RSMo 1994, provides that chapter 355 shall be known as the "Missouri Nonprofit Corporation Act." Inferably, ASL is a corporation organized under that chapter.

2. Section 64.660.1, RSMo 1994, authorizes an appeal from a decision of a county planning and zoning commission to the county board of zoning adjustment. References to statutes in this opinion are to RSMo 1994.

3. Section 64.660.2 authorizes a landowner aggrieved by a decision of a county board of zoning adjustment to petition the circuit court for relief.

4. Section 64.660.2 authorizes any party to appeal from the circuit court's judgment to "the appellate court having jurisdiction."

surrounding uses, impact on environmental quality and availability of public infrastructure and services."

The "absolute" policies referred to in the above excerpt are set forth in chapter 10 of the UDC. Absolute policies address subjects including wastewater control, on-site sewage disposal, soil and erosion control, storm drainage, utilities, access to existing roads and other essentials inherent in real estate development. Section 9–10.A.1 of the UDC provides that failure to comply with any relevant absolute policy shall result in denial of a permit.

The parties to this appeal agree that ASL complied with all relevant absolute policies. Commission's denial of ASL's application was based on Commission's finding (upheld by Board and the circuit court) that ASL failed to satisfy the "relative" policies. Consequently, the issues in this appeal pertain to only relative policies.

Section 2–330 of the UDC reads:

"**Relative Policy**—Relative policies encourage or discourage certain kinds of performance by developments. A development must receive a cumulative score, on all relative policies, of 'zero' (0) or better to receive approval."

The scoring standards for relative policies are spelled out in § 9–10.A.2 of the UDC:

"Each relative policy has been assigned an importance factor ranging from the numbers 'one' (1) through 'five' (5), as explained in Table 9–1. A development's performance on each relative policy is rated on a scale that ranges from 'minus two' (–2) to 'plus two' (+2), as explained in Table 9–2. The score on each relative policy is determined by multiplying its importance factor by its performance rating."

Table 9–1 reads:

"**Assignment of Importance Factors**

(1) is assigned to the least important relative policies

(2) is assigned to relative policies of minor importance

(3) is assigned to relative policies of average or normal importance

(4) is assigned to important relative policies

(5) is assigned to the most important relative policies[.]"

Table 9–2 reads:

"**Assignment of Performance Ratings**

(+2) is awarded for creating a significant public benefit with no substantial public detriment or for an excellent job of implementing the policy.

(+1) is awarded for creating some public benefit, mitigating a public detriment, or for doing a good job of implementing the policy.

(0) is awarded when the policy is irrelevant to the proposed development, if there is not public benefit or detriment, if there is a public detriment which is fully mitigated, or for a marginal job of implementing the policy.

(–1) is awarded for an inadequate job of implementing the policy or when some public detriment is created.

(–2) is awarded when there is essentially no effort at policy implementation or a significant public detriment is created."

Commission scored ASL on 39 relative policies. Commission awarded ASL a minus two on one policy, a minus one on two policies, a zero on thirty-one policies, and a plus one on five policies. Commission did not award ASL a plus two on any policy.

Because of the importance factors of the policies on which ASL received the five scores of plus one, ASL amassed a "plus" total of fifteen. However, because of the importance factor of the policy on which ASL received the score of minus two, and the importance factors of the two policies on which ASL received the scores of minus one, ASL amassed a "minus" total of twenty. The result was a cumulative score of minus five, which was fatal to ASL's appli-

cation under § 2–330 of the UDC, quoted earlier.

ASL's sole claim of error in this appeal is that there was no competent and substantial evidence to support the three minus scores. As shall become evident *infra,* a score of zero on either of the two policies on which ASL received a score of minus one, or a score of minus one on the policy on which ASL received the score of minus two, would result in a cumulative score of zero, which would entitle ASL to the permit.

■ Although this case reaches this court by appeal from the circuit court, this court reviews Board's decision, not the circuit court's judgment. *Ode v. Board of Zoning Adjustment of Platte County,* 796 S.W.2d 81, 83[2] (Mo.App. W.D.1990). This court's review is confined to a determination of whether Board's action was authorized by law and whether Board's decision was supported by competent and substantial evidence on the whole record. *Id.* at [3].

The record was created in stages. The first stage was a hearing conducted by Commission on March 3, 1997. Individuals supporting and opposing ASL's application appeared and spoke. Their remarks are preserved in a transcript. After the speakers finished, the presiding member of Commission announced Commission would reconvene March 17, 1997, to score ASL's application.

On March 7, 1997, ASL's lawyer submitted a written "position statement" to Commission.

Commission reconvened March 17, 1997, and, as reported earlier in this opinion, scored ASL on 39 relative policies. Those proceedings are also preserved in a transcript. The scores were recorded on a document denominated "Performance Criteria Evaluation Score Sheet," henceforth referred to as the "Scorepad."

When ASL appeared before Board to present its appeal from Commission's denial, ASL offered in evidence, and Board received: (a) ASL's application to Commission for the permit[5] and supporting documents attached thereto, (b) a copy of the UDC, (c) transcripts of Commission's proceedings of March 3, 1997, and March 17, 1997, (d) the "official minutes" of Commission's proceedings of March 3, 1997, and March 17, 1997, (e) the Scorepad, (f) the "position statement" ASL submitted to Commission on March 7, 1997, (g) ASL's notice of appeal to Board, and (h) documents in Commission's "staff records" including materials submitted by persons opposing ASL's application.

After the above items were presented, three people spoke at Board's hearing: ASL's lawyer, Commission's "Administrator," and a citizen opposing ASL's application. Their remarks are preserved in a transcript.

The record brought to this court comprises items "(a)" through "(h)" presented to Board, together with the transcript of Board's hearing.

The first of the three minus scores received by ASL was on a relative policy identified in the UDC as § 11–20.A. That policy reads:

> "**Off-Site Nuisances**—Off-site nuisances include but are not limited to: dust, smoke, odors, noise, vibration, light, glare, heat, and increased discharge or runoff of stormwater or treated wastewater that affect properties other than that on which it originates. Potential or existing off-site nuisances are encouraged to be mitigated by appropriate means. The means of mitigation shall be presented in detail with the application for a permit. Where it cannot be demonstrated that a potential or existing off-site nuisance will be acceptably mitigated, the development generating that nuisance is discouraged.

---

**5.** A permit for a structure of the type ASL proposed to erect is classified by § 4–10.C of the UDC as a "Division III" permit.

1. Creating or increasing a potential or existing off-site nuisance. (Importance Factor = 5)
2. Mitigation of potential or existing off-site nuisances. (Importance Factor = 5)"

Commission awarded ASL a minus one on subsection 1 of the above policy and a zero on subsection 2. Because each subsection carries an importance factor of five, Commission recorded a score of minus five for ASL on subsection 1 (and, of course, a score of zero on subsection 2). As this court comprehends ASL's claim of error, ASL attacks only the score on subsection 1.

According to ASL, because of the way in which relative policy § 11–20.A is written, this court should apply a canon of statutory construction known as the rule of *ejusdem generis*. As explained in *Alumax Foils, Inc. v. City of St. Louis*, 959 S.W.2d 836, 838[3] (Mo.App. E.D.1997), that rule provides:

> "[w]here general words follow specific words in a statutory enumeration, the general words are construed to embrace only objects similar in nature to those objects enumerated by the preceding specific words."

ASL takes the first specific word in § 11–20.A—dust—and endeavors to demonstrate there is no competent and substantial evidence in the record to support a finding that construction and operation of the proposed animal shelter will create or increase a potential or existing off-site nuisance [6] attributable to dust. ASL repeats the exercise for each successive specific term in § 11–20.A, an exhausting task consuming nineteen pages of ASL's 82–page brief.

A description of the animal shelter ASL seeks to construct and operate is essential in understanding ASL's claim of error.

ASL owns a vacant 4.42–acre tract. Paul Spanski, ASL's "general administrator," described the tract's location thus: "[I]t's about halfway between Nixa and Clever and it adjoins Missouri 14 and it's just east of Green Valley Creek."

According to Spanski, the proposed shelter is designed to accommodate "44 adult dogs, 20 adult cats, 15 to 20 kittens [and] 15 to 20 puppies." The planned structure, described by Spanski as a "low ranch-type building, single story, gabled roof," will contain a veterinarian's room, an "isolation room," a kitchen, a reception area, and a "small office/conference area." Also, said Spanski, "[T]here will be a secure enclosure that will be available to the public after hours for the drop-off of animals."

Regarding the size of the building, Spanski explained: "The total footage for the building is about 4150 square feet. The bulk of the building is about 100 feet long, 48 feet wide at the widest point, and about 18 feet high."

The parties agree in their briefs that parking and driveways will cover approximately 8,000 square feet, hence the total area to be developed will amount to some 12,000 square feet. ASL emphasizes that is "less than ten percent of the [4.42–acre] tract."

■ Respondents, countering ASL's claim of error about the score of minus one on subsection 1 of § 11–20.A, maintain there is competent and substantial evidence in the record to support a finding that construction and operation of the proposed shelter would create a potential off-site nuisance attributable to three of the sources listed in § 11–20.A—noise, storm-water runoff and discharge of treated wastewater. Evidence regarding those three is set forth seriatim.

As to noise, ASL presented evidence that the building would be constructed "as

---

6. Section 2–280 of the UDC defines off-site nuisance as:

"Any potential nuisance (i.e., noise, vibration, light, heat, glare, increased discharge or runoff of storm-water or treated wastewater, odor, smoke, dust, etc.) that affects properties other than that on which it originates."

soundproof as possible," and all animals would be kept inside. Additionally, ASL's architect said the enclosure for after-hours "drop-off" of animals would be constructed to "minimize" noise.

■ Opponents presented evidence that people who now abandon unwanted animals throughout the county will, if the shelter is built, abandon them near it "in hopes that the . . . shelter will take them in,"[7] thus creating a concentration of unrestrained animals in the vicinity of the shelter.

ASL argues: "[A] third party discharging an unwanted animal on the grounds of the . . . shelter is not an activity of [ASL], and is not contemplated by [§ ] 11–20.A." Consequently, says ASL, the rule of *ejusdem generis* should have barred Board from treating this potential nuisance as one attributable to ASL.

This court agrees that ASL cannot prevent individuals from turning animals loose near the shelter instead of placing them in it. Nonetheless, this court holds Board could reasonably find some individuals would behave as described by the opponents—human nature being what it is—leaving abandoned animals to roam the vicinity of the shelter creating noise and other potential annoyances such as frightening children and harassing livestock.

This court does not ignore Spanski's assurance that in "rural type shelters," only two or three animals are dropped off at night each week. However, because the determination of credibility of witnesses in a contested case before an administrative agency is left to the agency, *Scott Tie Company, Inc. v. Missouri Clean Water Commission*, 972 S.W.2d 580, 584[3] (Mo. App. S.D.1998), Board was not required to accept Spanski's low estimate.

This court likewise does not ignore the evidence that the residence nearest the proposed shelter is approximately 1,000 feet away. Despite that space, Board could reasonably find that animals abandoned near the proposed shelter would not remain stationary, but would migrate into adjacent areas.[8]

As to stormwater runoff, ASL presented evidence that the increased flow which would result from placing the building and parking lot on the vacant site would not create a nuisance for surrounding properties because ASL's architects and engineers designed a "detention area" that complies with a "formula" used for years "by the City of Springfield, and neighboring counties." According to ASL's experts, the "flow rate" from the basin "is small enough not to cause harm to the existing roadside ditch which will receive the flows." Furthermore, assured the experts, the design of the detention area ensures "adequate separation [of stormwater] from the underground sewage disposal field."

Respondents argue that inclusion of the stormwater detention basin in the design for the project is a tacit admission that construction of the building and parking lot will increase stormwater runoff, thereby creating a potential off-site nuisance. Opponents expressed such a concern, emphasizing that the proposed shelter site "exists at the upper end of a roadside channel which dumps into a wet-weather creek that supplies water to . . . farm animals as well as wildlife in the area."

As to discharge of treated wastewater, ASL presented evidence that sewage—human and animal—from the proposed shelter would be disposed of by a "low pressure pipe septic system" approved by the

---

**7.** One opponent surmised this would occur "so they don't have to pay the fee that is incurred when you drop off a dog."

**8.** Describing the area surrounding the proposed shelter, Commission's Administrator said, without contradiction:

"Surrounding land uses to the north is agricultural, very low density residential, and low density residential. To the south is agricultural and very low density residential. To the east is agricultural, very low density residential. To the west is agricultural and very low density residential and low density residential."

Christian County Health Department. The system would utilize a 2,000 gallon "dosing chamber" and a 2,000 gallon septic tank. All lateral lines would be situated on ASL's tract. According to ASL, the system would handle "not less than 700 gallons of wastewater per day." Commission's Administrator said the septic system was "sized according to expected capacities."

A speaker for the opponents asserted that "the agricultural engineer for Webster County"[9] calculated the proposed shelter's estimated water usage from ASL's "paperwork" and concluded the shelter will use at least 845 gallons per day. The speaker continued:

> "That equals to not less than 5,915 gallons a week or 25,350 gallons per month.
>
> At this rate, at least 308,425 gallons of animal sewage will go through their 2,000–gallon septic tank and saturate the ground. How long will it take before this massive volume of animal sewage contaminates the groundwater that our wells are fed from?
>
> And the amount of water necessary for their proposition is incompatible with the limited amount of acreage provided. How long will it take before this amount of water usage drains the wells that supply our homes water and makes us have to drill deeper wells?
>
> This volume of sewage is more than what three average families would use. Christian County will not allow three families to put wells and septic systems on a 4.4–acre lot[.]"

ASL points out that it satisfied the UDC's "absolute" policy regarding on-site sewage disposal (§ 10–10.C) when the Christian County Health Department approved ASL's proposed septic system. Therefore, reasons ASL, a finding that the discharge of treated wastewater from the septic system would create a potential off-site nuisance under subsection 1 of § 11–20.A of the UDC would be arbitrary.

This court disagrees. The Christian County Health Department, in approving ASL's proposed septic system, apparently relied solely on information submitted by ASL, whereas Board had the benefit of the opponents' presentation.

Respondents remind this court that in reviewing Board's denial of ASL's application, this court must view the evidence in the light most favorable to Board's decision. *State ex rel. Presbyterian Church of Washington, Missouri v. City of Washington,* 911 S.W.2d 697, 701[8] (Mo.App. E.D. 1995). Viewing the evidence that way, and mindful that under subsection 1 of § 11–20.A of the UDC, a score of minus one is authorized where a proposed development creates a *potential* off-site nuisance, this court holds that while the evidence as to noise from abandoned animals (and other annoyances by them) might not alone have supported a score of minus one, that evidence combined with the evidence as to stormwater runoff and discharge of treated wastewater was sufficient to support such a score.

The second of the three minus scores received by ASL was on subsection 1 of a relative policy identified in the UDC as § 11–20.B. That policy, including subsection 1, reads:

> **Compatibility Factors**—Compatibility will be determined by making reference to the Christian County Comprehensive Plan, considering other use permits granted since the adoption of the Plan, recommendations for future land use in the area, and by examining the area surrounding the pending land use change to determine the existence of similar uses. Similar uses do not have to be immediately adjoining the proposed land use change in order to influence the factor of compatibility. The compatibility or incompatibility of new development or redevelopment with neighboring uses shall be assessed using the following factors:

9. This court takes judicial notice that Webster County adjoins Christian County. *Cf. State v.*

*Bringleson,* 905 S.W.2d 882, 886[3] (Mo.App. S.D.1995).

1. Land use. (Importance Factor = 5) ..."

Commission awarded ASL a minus two on subsection 1. Because that subsection carries an importance factor of five, Commission recorded a score of minus ten for ASL on subsection 1.

ASL points out that § 11–20.B required Commission—and thereafter Board—to determine land use compatibility by referring to the "Christian County Comprehensive Plan." This opinion henceforth refers to that document as the "Plan."

At Commission's hearing, a speaker for the opponents quoted provisions from the Plan and asserted the proposed animal shelter was incompatible therewith.

ASL maintains that inasmuch as the Plan "was never introduced into evidence," it "cannot be the basis for a negative score." As authority for that hypothesis, ASL cites *State ex rel. Barnes v. Hunter,* 867 S.W.2d 282 (Mo.App. S.D.1993), which holds a court may not take judicial notice of the existence or contents of a city ordinance. *Id.* at 283[4]. Furthermore, says *Barnes,* when an ordinance prescribes the standards for the contents of a use permit, the ordinance must be entered in the record and its absence is a fatal defect. *Id.* at 283–84[5].

■ The instant case differs from *Barnes* in that here, ASL concedes the opposing speaker read the provisions of the Plan into the record *without objection.* Assuming, arguendo, that the speaker's quotations from the Plan were hearsay, Missouri courts nonetheless hold hearsay evidence admitted without objection may be utilized as substantial and competent evidence to support an administrative agency's finding. *Housing Authority of the City of St. Charles v. Board of Adjustment of the City of St. Charles,* 941 S.W.2d 725, 727[4] (Mo.App. E.D.1997); *Hacienda Enterprises # 2, Inc. v. Smarr,* 841 S.W.2d 807, 811[8] (Mo.App. E.D.1992). Furthermore, § 536.070, which governs procedure before administrative agencies, provides in subsection 8 that "[e]vidence received without objection which has probative value shall be considered by the agency along with the other evidence in the case." *Housing Authority of the City of St. Charles,* 941 S.W.2d at 727. Accordingly, the provisions of the Plan quoted by the speaker opposing ASL's application were eligible for consideration by Commission, Board and the circuit court, and may be considered by this court.

■ The speaker narrated the following Plan provisions:

"In the panhandle section [of Christian County] the James River serves as a natural boundary between future urbanization and agricultural uses. Development occurring in these areas is recommended to be limited to very low density residential development so as to minimize potential conflicts and incompatibility of urban uses with agricultural activity.... [These areas are] recommended primarily for continued agriculture uses.

. . . .

Spot commercial development in residential areas should be discouraged.... Development of single commercial office uses should not be permitted and ... encroachment by incompatible nonresidential uses can undermine the stability of residential neighborhoods and negatively affect property values."

ASL proclaims the objective of the first segment quoted above is to prevent "dense residential development in agricultural areas." According to ASL, that restriction is irrelevant in this case, as the proposed shelter will not constitute dense residential development.

ASL misreads the Plan. The obvious objective is to *limit* development to *only* very low density residential use, thereby minimizing potential conflict with existing agricultural activity in the area.

■ ASL next argues that inasmuch as it is a nonprofit organization, the proposed shelter will not constitute a commercial development in a residential area.

To the contrary, Commission's Administrator told Board there is no "differentiation" between "nonprofit" or "for profit." Furthermore, a speaker opposing ASL's application told Board the proposed shelter would resemble a kennel, defined by § 2–220 of the UDC as:

"A commercial operation that involves five (5) or more dogs over the age of six (6) months of age, and: provides food and shelter and care of animals for purposes not primarily related to medical care (a kennel may or may not be run by or associated with a veterinarian), and/or engages in the breeding of animals for retail sale."

The speaker emphasized that § 16–25 of the UDC barred a kennel as a home occupation on a parcel of fewer than twenty acres.

For the purpose of determining whether the proposed shelter is compatible with the existing uses of the land surrounding the proposed site,[10] this court sees scant difference between the proposed shelter and a kennel as defined by § 2–220 (quoted above). As with a kennel, numerous animals will be brought to the shelter, kept there, and eventually removed, either alive or dead.[11]

Given the existing uses of the land surrounding the proposed site,[12] and viewing the record favorably to Board's decision, this court holds there was ample evidence to support a finding that the shelter planned by ASL would be incompatible with the current uses.

Two other provisions from the Plan (quoted earlier) are that "spot" commercial development in residential areas should be discouraged and that encroachment by "incompatible nonresidential uses" can "undermine the stability of residential neigh-

borhoods and negatively affect property values."

A speaker opposing ASL's application told Board that at least six new homes had been built within a two-mile radius of the proposed shelter site "since the first proposal was rejected."[13] Respondents maintain that even if ASL considers itself not to be "commercial," the proposed shelter is clearly a "nonresidential" use that could undermine the stability of residential neighborhoods and negatively affect property values.

This court further notes that a speaker opposing ASL's application told Commission that if ASL received the permit, a precedent would be set for more property in the area to be changed to commercial use. Closely akin to that concern is a scenario articulated by two speakers that if the proposed shelter failed financially, the facility would then be used for some other activity incompatible with the neighboring uses.

Mindful that Table 9–2 (quoted earlier) authorizes a performance rating of minus two when a proposed development creates a significant public detriment, and recognizing that zoning issues often involve "questions of sensitivities and perceptions which are appropriate for political rather than judicial resolution," *Chaminade College v. City of Creve Coeur,* 956 S.W.2d 440, 442 (Mo.App. E.D.1997), this court holds the evidence favorable to Board's decision was sufficient to support a score of minus two on subsection 1 of § 11–20.B.

 The final minus score received by ASL was on subsection 1 of a relative policy identified in the UDC as § 11–25.A. That policy, including subsection 1, reads:

---

**10.** Those uses are set forth in footnote 8, *supra.*

**11.** Spanski told Commission that animals dying at the shelter would be kept in a freezer until picked up for cremation by a pet cemetery.

**12.** Footnote 8, *supra.* A speaker opposing the proposed shelter told Board there was no commercial development "within three and a half miles in any direction at this time."

**13.** The same speaker told Commission that ASL received "a negative 27 score two years ago for this proposal." This court deduces that would have been sometime in 1995.

"**Right to Farm**—Development patterns that could limit the viability of existing agricultural uses are discouraged. Limits to the viability of existing uses could include potential nuisance or liability suits, predation of stock by domestic dogs, and traffic conflicts. Developments are encouraged to avoid prime agricultural lands which are classified as Class I–IV Crop lands.

1. Developments limiting the viability of existing agricultural uses. (Importance Factor = 5)
. . ."

Commission awarded ASL a minus one on subsection 1. Because that subsection carries an importance factor of five, Commission recorded a score of minus five for ASL on subsection 1.

A speaker opposing ASL's application told Commission the proposed shelter site is classified as "prime agricultural land." ASL's lawyer agreed that the proposed site is "Class 4" farmland. It thus appears that § 11–25.A (above) applies to the proposed site.

ASL insists there was no competent and substantial evidence that the planned shelter would limit the viability of existing agricultural uses. According to ASL, there was no proof that the shelter would constitute a nuisance, nor was there any showing that the shelter would escalate the potential for liability suits, predation of stock by domestic dogs, or traffic conflicts.

Respondents point out that the obvious purpose of § 11–25.A is to prevent a land use change [14] in a prime agricultural area if the change could imperil agricultural uses by increasing the risks to agriculture identified in that section. One of those risks, predation of livestock by dogs abandoned near the proposed shelter, has already been noted in this opinion. Two speakers pointed out that the same potential threat would exist as to children awaiting school buses in the vicinity of the proposed shelter.

This court recognizes there was evidence to support an argument by ASL that it should have received a score of no worse than zero on subsection 1 of § 11–25.A. However, this court observes that the UDC's scoring standards require a somewhat subjective assessment of the potential impact of the proposed shelter on existing agricultural uses in this prime agricultural area. Given that feature of the UDC, this court holds there was sufficient evidence to support a finding that the land use change proposed by ASL would create some public detriment by limiting the viability of existing agricultural uses, a result proscribed by § 11–25.A.

█ If evidence before an administrative body warrants either of two opposed findings, a reviewing court is bound by the administrative determination and it is irrelevant that there is supportive evidence for a contrary finding. *Davco Food Inc. v. City of Bridgeton*, 725 S.W.2d 32, 34[1] (Mo.App. E.D.1986). Accordingly, this court holds that under the scoring criteria of Table 9–2 (quoted earlier), there was sufficient evidence to support a performance rating of minus one on subsection 1 of § 11–25.A.

ASL's claim of error is denied and the circuit court's judgment upholding Board's decision is affirmed.

PREWITT, P.J., and PARRISH, J., concur.

---

14. The term "development" appearing in § 11–25.A is synonymous with a land use change, as § 2–110 of the UDC defines "development" as "any proposed land use change . . . construction of a building . . . that is required to have a permit[.]"